T.C. Memo. 2003-90

UNITED STATES TAX COURT

JERRY S. PAYNE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12473-99.                    Filed March 27, 2003.

Prior to and during the audit years (1989 and 1990), P practiced law in Houston, Texas.  He was also involved in the real estate business through his investment in P&P, Inc.  Prior to 1989, P provided legal services to X, Inc., which operated a topless dance club in Houston, and to H, a 50-percent shareholder of X, Inc., and manager of the club.  In payment of the overdue fees for those services, P acquired most of the assets and all of the stock of X, Inc., and he assumed management control of the club.  P leased the assets back to X, Inc., for use by the club.  In November 1990, after securing a permit to continue to conduct a sexually oriented business at the club's premises and a mixed beverage permit (liquor license) for Y, Inc. (also wholly owned by P), at such premises, P caused the club's operation and assets (including the leased assets) to be transferred from X, Inc., to Y, Inc.  R determined that (1) "withdrawal authorizations" signed by P, in 1989 and 1990, for various sums of money were disguised dividends to P rather than

authorizations for H to "tip" dancers in the amounts authorized, and (2) the 1990 transfer of the club's operation from X, Inc. to Y, Inc., gave rise to a taxable liquidating dividend from X, Inc., to P. R also disallowed 1989 and 1990 Schedule C deductions claimed by P for parking fees and for bad debt deductions as guarantor of construction loans defaulted upon by P&P, Inc. R also determined that P was subject to the sec. 6662, I.R.C., accuracy-related penalty.

1. Held: The amounts listed on the "withdrawal authorizations" constituted valid promotional expenses of X, Inc., in part, and disguised dividends taxable to P, in part.

2. Held, further, the transfer of the club's operation from X, Inc., to Y, Inc., constituted a tax-free reorganization under sec. 368(a)(1)(D), I.R.C., that did not involve a distribution of "boot" taxable to P under sec. 356(a)(1)(B) and (2), I.R.C.

3. Held, further, R's disallowance of P's Schedule C deductions for parking fees and for bad debts is sustained.

4. Held, further, R's penalty against P is sustained with respect to the deficiencies arising out of the disallowances of P's Schedule C deductions.


Jerry S. Payne, pro se.

Kathryn Bellis, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge: By notice of deficiency dated April 15, 1999 (the notice), respondent determined deficiencies in and additions to petitioner's Federal income tax liabilities as follows:

| Tax Year Ending | | Additions to Tax | |
| December 31 | Deficiency | Sec. 6651(a)(1) | Sec. 6663[*] |
| 1989 | $127,879 | $31,970 | $95,909 |
| 1990 | 204,353 | 51,088 | 153,265 |

[*] In the event that petitioner is not held liable for the sec. 6663 fraud penalty, respondent made the alternative determination that the underpayments of tax for 1989 and 1990 are subject to sec. 6662(a) accuracy-related penalties for negligence or disregard of rules or regulations equal to 20 percent of such underpayments.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

The parties have resolved certain issues. The issues remaining for decision are (1) whether petitioner received constructive dividends from his wholly owned corporation, 2618, Inc. (2618), in the sums of $70,159 and $26,345 for 1989 and 1990 (sometimes, the audit years), respectively[1] (the constructive dividend issue), (2) whether petitioner's 1990 gross income includes a liquidating dividend from 2618 in the sum of $40,011[2] (the liquidating dividend issue), (3) whether petitioner is entitled to Schedule C, Profit or Loss From Business, deductions

---

[1] In the notice, respondent determined that petitioner received constructive dividends of $122,722 and $50,642 for 1989 and 1990, respectively. On brief, respondent concedes $52,563 for 1989 and $24,297 for 1990 of those proposed adjustments.

[2] In the notice, respondent determined that the amount of the 1990 liquidating dividend from 2618, Inc., was $535,000.

in excess of $207,295 and $133,264 for 1989 and 1990, respectively,[3] and, more specifically, whether petitioner is entitled to deductions for parking expenses of $1,443 and $1,492 and business bad debts of $14,000 and $8,000 for 1989 and 1990, respectively, and (4) whether petitioner is liable for the accuracy-related penalty under section 6662(a) for each of the audit years.[4] A fifth issue, raised by petitioner for the first time in his opening brief, is whether the notice of deficiency, as it pertains to the constructive dividend and liquidating dividend issues, is "arbitrary and excessive", thereby shifting to respondent the burden of proof as to the existence and amount of any deficiency for the audit years. In the absence of such a finding, petitioner bears the burden of proof. See Rule 142(a).[5]

---

[3] In the notice, respondent determined that petitioner's allowable Schedule C expenses for 1989 and 1990, respectively, were $163,461 and $111,294. The additional allowances resulted from respondent's examination of checks written by petitioner during 1989 and 1990.

[4] Petitioner concedes that he is liable for additions to tax under sec. 6651(a)(1) in amounts to be determined for 1989 and 1990, and respondent concedes that petitioner is not liable for the civil fraud penalty under sec. 6663 for such years.

[5] Under certain circumstances, sec. 7491(a)(1) shifts the burden of proof to respondent. Sec. 7491 applies to court proceedings arising in connection with examinations commencing after July 22, 1998, the date of enactment of the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, 112 Stat. 685. See RRA 1998 sec. 3001(c), 112 Stat 727. Respondent alleges that the examination in this case
(continued...)

## FINDINGS OF FACT[6]

Some facts are stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. In addition, as they relate to this case and were accepted by the Court of Appeals, we incorporate relevant portions of our findings of fact in Payne v. Commissioner, T.C. Memo. 1998-227, revd. 224 F.3d 415 (5th Cir. 2000), an earlier case involving deficiency determinations against petitioner for the 2 prior taxable years (1987 and 1988).[7]

At the time the petition was filed, petitioner resided in Houston, Texas.

---

[5](...continued)
commenced prior to July 22, 1998. Petitioner does not dispute that contention. Accordingly, sec. 7491 is inapplicable to this case.

[6] Petitioner has failed to set forth objections to respondent's proposed findings of fact. Accordingly, we conclude that petitioner concedes that respondent's proposed findings of fact are correct except to the extent that petitioner's findings of fact are clearly inconsistent therewith. See Jonson v. Commissioner, 118 T.C. 106, 108 n.4 (2002).

[7] We do not believe that the facts that we incorporate are controversial. We incorporate them principally to provide background material. Indeed, at the call of this case from the calendar, petitioner stated that the prior case involves "exactly the same facts" as this case. See Peninsula Props. Co. v. Commissioner, 47 B.T.A. 84, 85 (1942), and Miller v. Commissioner, 47 B.T.A. 68, 69 (1942), in each of which we incorporated by reference all of our findings of fact in the other and in a third related case involving individuals and entities common to all three cases.

During the audit years, petitioner owned and operated, in Houston, Texas, a law firm under the name of Payne & Associates. Petitioner's law practice primarily involved civil litigation. Through Payne & Associates, petitioner was self-employed as a lawyer and in real estate development. He reported his income and expenses from those activities, on a cash basis, on Schedule C attached to his individual returns. Petitioner was also a 50-percent shareholder in Payne & Potter, Inc., a real estate development corporation that was insolvent by the end of 1986.

Petitioner's Involvement With and Acquisition of the Stock of 2618, Inc.

Prior to and during the audit years, 2618 owned and operated a topless dance club in Houston, Texas, under the name of Caligula XXI (the club). From 1986 through 1988, petitioner represented 2618 and the club in litigation against the city of Houston and others arising out of the city's denial of the club's application for a permit to conduct a sexually oriented business (the SOB permit), and against the Texas Alcoholic Beverage Commission (TABC) for its refusal to renew the club's mixed beverage permit permitting the sale of alcohol to patrons. Petitioner also provided legal representation to Gerhard Helmle (Helmle), one of the two 50-percent shareholders of the stock of 2618, in criminal proceedings against Helmle for the possession of illegal drugs. Prior to and during the audit years, Helmle was involved in managing the operation of the club.

Beginning in 1987, petitioner became gradually more involved in the business operations and finances of 2618 and the club, principally out of concern that Helmle might not be able to pay legal fees owed to petitioner in excess of $500,000. During 1987, petitioner entered into agreements with Helmle and others, which, in consideration of a management fee, gave petitioner the right "to control and manage the activities of the club CALIGULA XXI", and placed him "in total control of all financial and managerial decisions at the club". The agreements also enabled 2618 to redeem the stock of the other 50-percent shareholder (making Helmle the sole shareholder) with the proceeds of a $275,000 bank loan to petitioner that, pursuant to the agreements, was to be repaid (including interest) by means of scheduled monthly payments from 2618 to petitioner.

On February 15, 1988, ownership interests in the following tangible and intangible personal property relating to the club were transferred to petitioner in satisfaction of $35,000 in legal fees owed to him: (1) 2618's leasehold interest in the building in which the club operated; (2) furniture, furnishings, fixtures and leasehold improvements in the building; and (3) the right to use the Caligula XXI name. Petitioner then leased such property back to 2618.

On March 15, 1988, petitioner agreed to acquire Helmle's stock in 2618 and, thereby, become the sole shareholder in 2618.

The acquisition took the form of a stock purchase whereby Helmle's stock was transferred to petitioner in exchange for $10 in cash plus a $500,000 promissory note on which petitioner never made any payments.  In the earlier case involving petitioner's 1987 and 1988 taxable years, we found as a fact that the March 15, 1988, agreement was a sham and that petitioner received the stock of 2618 not by purchase, but as payment in satisfaction of the more than $500,000 in legal fees owed to him by 2618 and by Helmle.[8]  The agreement was conditional, to become effective if and when TABC granted 2618's application for a mixed beverage permit.  That condition was satisfied when, in August 1988, a settlement agreement was reached between TABC and the club pursuant to which TABC agreed to and did issue the permit to the club effective September 20, 1988.  Prior to that date, petitioner had become president of 2618.

Transfer of the Club to JKP Enterprises, Inc. (JKP)

On February 20, 1988, petitioner entered into an agreement (the February 20 agreement) with the owners of the building in which the club operated whereby it was agreed that (1) petitioner had replaced 2618 as primary lessee by virtue of his February 15, 1988, acquisition of 2618's leasehold interest in the premises,

---

[8]  Petitioner did not contest our characterization of the transaction as a payment in-kind for overdue legal fees.  Rather, he contended that the 2618 stock was worthless at the time he received it.  See Payne v. Commissioner, 224 F.3d 415, 419 (5th Cir. 2000), revg. T.C. Memo. 1998-227.

(2) petitioner would remain the primary lessee in respect of all future leases of the premises for use by new corporations formed by petitioner, (3) petitioner intended for 2618 to remain as his sublessee until an SOB permit and "liquor license" (both of which were then the subject of litigation) were acquired for the premises, and (4) at that time, petitioner would make JKP his sublessee under a 10-year sublease.

JKP was incorporated in Texas on February 22, 1990. Petitioner was the sole shareholder of JKP. The litigation against the city of Houston resulted in the issuance, on March 14, 1990, of an SOB permit to Virginia Sanders, who resided with petitioner, was his legal assistant, and was president of JKP. The permit was issued for use at the club's premises, whereupon petitioner applied for a mixed beverage permit on behalf of JKP. Shortly after the issuance of such permit on or about November 1, 1990, operation of the club was transferred from 2618 to JKP, which became the sublessee of the club's premises from petitioner pursuant to the February 20 agreement and lessee, from petitioner, of the tangible and intangible personal property relating to the operation of the club that had been acquired by petitioner from 2618 on February 15, 1988. In January 1991, JKP sold all of the assets needed to operate the club, including its leasehold interest in the premises and in the other assets leased from petitioner, for $1.1 million.

The Withdrawal Authorizations

During the audit years, petitioner signed withdrawal authorizations (for the most part, printed forms entitled "Tip Authorization Voucher" or "Guest Check") (the WAs) that authorized the expenditure of amounts charged to 2618's general ledger account entitled "Business Promotion/Travel". The WAs totaled $70,159 for 1989, and $26,345 through November 1990, when the operation of the club was taken over by JKP.

Petitioner signed the WAs by writing either "PAYNE" or, in some cases, "Jerry", or "Jerry Payne", or "JSP". The WAs also set forth a specific date and dollar amount, and they contained the notation "ProMo", all in the same handwriting. One of the 1990 WAs was prepared and signed by Virginia Sanders and contained the words "Jerry S. Payne Promotional Expense" and "paid out". On the forms entitled "Tip Authorization Voucher", petitioner's initials appeared on a signature line directly above the words "I hereby authorize the above tip."[9] Petitioner's initials also appeared at the bottom of the "Guest Check" forms. A number of the WAs contained the words "paid out", and on one

---

[9] Petitioner testified that the tip authorization vouchers were originally designed to enable customers to pay the dancers by means of a credit card rather than in cash. The club's customers utilized the vouchers to specify the credit card tip amount to be allocated to a particular dancer. Petitioner adapted the vouchers to his own use as authorizations for payment of the amounts specified thereon. Only the voucher amounts authorized by petitioner were charged to 2618's general ledger account entitled "Business Promotion/Travel".

such WA is the notation "Paid Out to Jerry Payne". Another WA contains the notation "Draw - Jerry's Vitamins - Sugar". On some of the WAs for 1989 (either guest check forms or blank pieces of paper), petitioner noted that he "took" the stated amount of money from a "safe" or a "bag" or "stack", or that he just "took" the stated amount. On other of the 1989 WAs (guest check forms only), the authorized amount was for specific items of food. Some of the WAs refer to a particular server or other person. Also, one WA, which is largely illegible, appears to be a note to someone named Vikki that petitioner "spent" $350 for some indecipherable purpose.

## Schedule C Deductions

### Parking

On line 28 of his Schedule Cs for the audit years ("Other expenses"), petitioner listed "parking" expenses of $1,443 for 1989 and $1,492 for 1990.

### Bad Debts

During 1989, petitioner paid $34,443 to Texas Commerce Bank (TCB), of which $19,921, represented deductible interest. During 1990, petitioner paid $13,644 to TCB. On line 9 of his Schedule Cs for the audit years ("Bad debts from sales or services"), petitioner treated $14,000 (for 1989) and $8,000 (for 1990) of such payments to TCB as giving rise to bad debt deductions.

OPINION

I. <u>Burden of Proof</u>

A. <u>Introduction</u>

Petitioner's argument that respondent bears the burden of proof with respect to the constructive dividend and liquidating dividend issues ostensibly raises two additional issues: (1) whether such argument, initially set forth in petitioner's post-trial opening brief, is timely and (2), if timely, whether it is sustainable on the ground that respondent's determinations are arbitrary and, therefore, invalid. For the reasons set forth in subsections B and C of this section I, we find it unnecessary to resolve those issues or even to assign the burden of proof with respect to the constructive dividend and liquidating dividend issues.

B. <u>The Constructive Dividend and Liquidating Dividend Issues Are Resolved on the Basis of Agreed Facts</u>

The facts upon which we base our decision with respect to both the constructive dividend and liquidating dividend issues are not in dispute.

1. <u>Constructive Dividend Issue</u>

In the notice, respondent determined that petitioner received constructive dividends equal to the entire amount charged to 2618's general ledger account entitled "Business Promotion/Travel". Respondent has conceded the deductibility of the amounts charged to that account in excess of amounts

reflected on the WAs. The only evidence relating to the characterization of the amounts reflected on the WAs as either constructive dividends to petitioner or deductible promotional expenses consists of the WAs themselves and petitioner's oral testimony. As discussed, infra, in section II, our decision that most of the WAs provided for and generated deductible promotional expenses is based solely upon those WAs, which are stipulated joint exhibits. The issue, as framed by the parties, is the extent to which the stipulated WAs either support or refute petitioner's oral testimony that all of the WAs authorized and resulted in the expenditure of amounts deductible by 2618 as promotional expenses, and we ultimately find that all but 12 WAs for 1989 and 7 WAs for 1990 (out of a total of 280 for 1989 and 177 for 1990), are consistent with and, therefore, support petitioner's position. On that basis, we sustain respondent's proposed adjustment only to the extent of the amounts reflected in those 12 WAs for 1989 and 7 WAs for 1990. With respect to those 19 WAs, we find that the notations thereon are more consistent with the conclusion that such amounts were distributed to petitioner for his personal use rather than for any deductible, business-related purpose.

2. Liquidating Dividend Issue

After respondent's concession as to the amount of any liquidating dividend, there are two issues for decision: an

issue of law and an issue of fact.  The issue of law is whether 2618's transfer of the club to JKP, in November 1990, constituted a taxable liquidation of 2618, under section 331, or a tax-free reorganization under section 368(a)(1)(D) and/or (F).  On that issue, we hold that such transfer constituted a tax-free reorganization under section 368(a)(1)(D).  See discussion, <u>infra</u> section III.  The issue of fact is whether, in connection with such transfer of assets from 2618 to JKP, we should accept respondent's argument that petitioner received $40,011 of assets taxable to him as a long-term capital gain pursuant to section 356(a)(1)(B) and (2), or petitioner's argument that he received nothing.  The only evidence offered by respondent in support of his position is the 1989 yearend balance sheet in Schedule L of 2618's 1989 return, which shows $40,011 of assets.  The 1989 return for 2618 is a joint, stipulated exhibit.  As discussed, <u>infra</u> section III, we find such balance sheet to be supportive of petitioner's position (reflected in his oral testimony) that he received nothing in connection with the November 1990, transfer of the club from 2618 to JKP rather than of respondent's position.

C.  <u>Lack of Need To Assign Burden of Proof</u>

Because we are able to dispose of both issues on the basis of undisputed or stipulated facts, we need not resolve the burden of proof issue raised by petitioner.  See <u>Deskins v.</u>

Commissioner, 87 T.C. 305, 322-323 n.17 (1986); Hustead v.

Commissioner, T.C. Memo. 1997-205.  "[T]he placement of the

burden of proof * * * would be controlling only if, as a matter

of law, the evidence presented by the parties must be deemed of

equal weight."  Brookfield Wire Co. v. Commissioner, 667 F.2d

551, 553 n.2 (1st Cir. 1981), affg. T.C. Memo. 1980-321.  As this

Court has stated:  "except for extraordinary burdens (e.g., in

fraud cases), the burden of proof is merely a 'tie-breaker' * * *

[it] is irrelevant unless the evidence is in equipoise."  Steiner

v. Commissioner, T.C. Memo. 1995-122.  Although assignment of the

burden of proof is potentially relevant at the outset of any

case, where (as in this case) the Court finds that the undisputed

facts favor one of the parties, the case is not determined on the

basis of which party bore the burden of proof, and the assignment

of burden of proof becomes irrelevant.[10]

Therefore, we have no need to assign the burden of proof

with respect to the constructive dividend and liquidating

dividend issues.

---

[10]  The same is true where there is conflicting evidence
with respect to a particular item of income or expense, but a
preponderance of the evidence favors one of the parties.  See
Kean v. Commissioner, 91 T.C. 575, 601 n.40 (1988) ("Our
determinations have been made on the basis of the preponderance
of the evidence; accordingly, it is immaterial * * * who bears
the burden of proof.  Deskins v. Commissioner, 87 T.C. 305, 323
n.17 (1986).").

II.  Constructive Dividend Issue

Petitioner alleges that all of the WAs were authorizations for Helmle to use the stated amounts, and no more than those amounts, to tip the club's dancers (as well as dancers at competing clubs) in order to assure that the club would be able to retain a sufficient number of "quality dancers".  Respondent counters that petitioner has not furnished credible evidence that the cash distributed by means of the WAs was used by petitioner for any business purpose.

Petitioner testified that he was advised by Helmle, who, according to petitioner, effectively ran the club on a day-to-day basis for petitioner during the audit years, that it was necessary to use club funds to tip the dancers and, in particular, the "quality dancers".  According to petitioner, the need to tip the dancers had become urgent in light of the pending litigation over the club's right to an SOB permit and the dancers' concern that the club would go out of business if it failed to secure the permit.  Petitioner testified that Helmle would take money out of the cash register and use it to tip dancers, both at Caligula XXI and at competing clubs (apparently to attract dancers at those other clubs to come work at Caligula XXI).  Petitioner contends that the sole purpose of the WAs was to restrict the amounts of cash that Helmle would be permitted to use for that purpose.

Petitioner testified that he would leave a WA, filled out and signed by him, in the cash register or with the bartender, and that Helmle could only take from the register the authorized amount. Petitioner further testified that he never received or took possession of any of the money shown on the WAs.

Respondent argues that petitioner's trial testimony was "self serving, inconsistent, conflicting, and generally not credible", and that petitioner failed to produce credible evidence that the cash and food distributed pursuant to the WAs were used for any business purpose. He suggests that petitioner's failure to call as witnesses any employees of the club or any dancers suggest that their testimony would have been negative. He concludes that, because petitioner failed to prove that the distributions reflected in the WAs were for any business purpose, they must be considered taxable dividends to petitioner.

The only portion of 2618's alleged expenditures for business promotion/travel that respondent treats as constructive dividends to petitioner is that reflected in the WAs. However, the WAs generally support and corroborate petitioner's characterization of the expenditures, not respondent's. The vast majority of the WAs simply contain the notation "pro mo" in addition to the date, the dollar amount, and petitioner's signature. There is no indication that the specified dollar amounts were to be paid to petitioner rather than to a third party pursuant to petitioner's

authorization.  The same is true for those WAs that specifically direct payments to or simply refer to a particular server or other person, and those that list specific food items, which in all cases, were for negligible amounts ($14 or less).  (On brief, petitioner characterized the latter as providing free meals to customers.)  Nor do we infer from petitioner's failure to obtain corroborating testimony from former club employees or dancers that such testimony would have been negative.  The events in question occurred some 12 to 13 years prior to the trial.  Presumably, the employees (e.g., bartenders and waiters) and the dancers, most of whom petitioner may not have known by name, would have been difficult or impossible to locate after so many years.  Moreover, in light of the corroboration afforded by the WAs themselves, we do not consider such testimony crucial to petitioner's case.  Cf. Pollack v. Commissioner, 47 T.C. 92, 108 (1966) (unexplained absence of crucial witness justified inference that his testimony would have been unfavorable), affd. 392 F.2d 409 (5th Cir. 1968).

Those WAs listing amounts as having been "paid out" or, in one case, "paid out to [petitioner]" do not corroborate petitioner's oral testimony.  Although it is possible that the notation "paid out" was written by an individual who had carried out petitioner's instruction to give the authorized amount to Helmle or to some other person for distribution to dancers, we

will not make that assumption in the absence of confirmatory evidence. Similarly, the WAs and other documentation indicating that the money was spent for petitioner's benefit or that he actually received the specified amounts (e.g., where petitioner wrote that he "took" or "spent" the money) do not support his oral testimony. Rather, those WAs indicate that the listed amounts were paid to or for the benefit of petitioner and not merely authorized by him for payment to another. In the absence of evidence that such money was used for a bona fide promotional purpose (e.g., as tips for dancers), we must assume that petitioner retained it. Therefore, we hold that the amounts in question totaling $4,577 for 1989 and $1,100 for 1990, constituted distributions to petitioner, taxable under section 301.

Respondent concedes that 2618 had no earnings and profits as of November 1990, and he does not challenge as inaccurate the negative retained earnings reflected on 2618's 1989 Schedule L as of both the beginning and end of 1989. Petitioner neither paid for his 2618 stock nor included any amount in income resulting from his receipt of such stock. Therefore, petitioner had a zero basis in such stock. Consequently, the 1989 distributions evidenced by WAs dated on or before September 20, 1989 (1 year after petitioner's acquisition of his 2618 stock), constituted short-term capital gain, and the balance of the 1989

distributions and all of the 1990 distributions constituted long-term capital gain. Secs. 301(c)(3)(A), 1222(1), 1222(3); Gross v. Commissioner, 23 T.C. 756, 768 (1955), affd. 236 F.2d 612 (2d Cir. 1956); see also Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.02[5], at 8-16 n.53 (7th ed. 2000). Application of those rules to petitioner results in his receipt of $4,217 of short-term capital gain for 1989, $360 of long-term capital gain for 1989, and $1,100 of long-term capital gain for 1990.

## III.  Liquidating Dividend Issue

### A.  Introduction

Respondent views JKP's November 1990 takeover of the business operation of 2618 as necessarily involving a taxable liquidation of 2618, which resulted in a deemed or actual capital gain distribution to petitioner of 2618's net assets under section 331(a)[11] in the sum of $535,000. Petitioner does not challenge respondent's characterization of the termination of 2618 as a taxable liquidation, but he argues that respondent failed to prove that he received any money or other property of value. On brief, respondent concedes that his valuation of the

---

[11] Sec. 331(a) provides that:

SEC. 331(a). Distributions in Complete Liquidation Treated as Exchanges.--Amounts received by a shareholder in a distribution in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

distributed assets of 2618 was incorrect, and he alleges that the liquidation distribution to petitioner consisted of the $40,011 of assets shown on the yearend balance sheet in Schedule L of 2618's 1989 return.[12]

On October 16, 2002, we issued an order directing the parties to file supplemental briefs addressing the issue of whether the cessation of business by 2618 and the assumption of its business operation by JKP in November 1990 constituted, in substance, a reorganization within the meaning of sections 368(a)(1)(D) ("D" reorganization) and/or 368(a)(1)(F)) ("F" reorganization) rather than a taxable liquidation of 2618 subject to section 331. In response, petitioner submitted a two-page statement in which he essentially reiterates his original position that he did not receive anything of value from 2618 when its business operation terminated in November 1990. Respondent filed a brief in which he states that, assuming the club's assets were either owned or leased (from petitioner) by 2618 and the club was being operated by 2618 rather than by petitioner "exclusively on his own behalf", he will concede that the transfer of the club's operation from 2618 to JKP meets all of the statutory requirements for a nondivisive "D" reorganization; i.e., there was a transfer by a corporation of substantially all

---

[12] A 1990 return was not filed by 2618, and the record is devoid of any balance sheet or other financial record for 2618 subsequent to Dec. 31, 1989.

of its assets to another corporation controlled by the sole shareholder of both corporations in exchange for stock of the transferee corporation followed by a distribution of the transferee stock to such shareholder, all pursuant to a plan of reorganization. Secs. 368(a)(1)(D), (c), 354(b)(1)(A) and (B).[13] Respondent also appears to concede that the transfer of the club's operation from 2618 to JKP meets the statutory requirements for an "F" reorganization: "a mere change in identity, form, or place of organization of one corporation, however effected", which respondent acknowledges may encompass a new corporation's mere acquisition of the assets of the old corporation, H. Conf. Rept. 97-760, 1982-2 C.B. 600, 634-635. Respondent argues, however, that, because JKP sold the club within 3 months of taking over its operation, the transaction may have failed to meet the nonstatutory requirement of continuity of business enterprise (COBE), applicable to any reorganization described in section 368(a) and firmly embedded in the regulations under section 368. See sec. 1.368-1(d), Income Tax

---

[13] Because petitioner already owned the stock of JKP there was no need for an actual exchange of 2618's assets for JKP stock followed by a distribution of the stock to petitioner. As respondent acknowledges, "[t]he law is well settled that where shareholders of the transferor corporation already own all of the stock of the transferee corporation, the issuance of further stock for exchange and distribution is not required." See DeGroff v. Commissioner, 54 T.C. 59, 71 n.7 (1970), affd. per curiam 444 F.2d 1385 (10th Cir. 1971), and the cases cited therein.

Regs. Specifically, respondent suggests that JKP's sale of the club's operation within 3 months of its acquisition "creates a strong inference" that the sale occurred as part of an overall plan commencing with the transfer of the operation from 2618 to JKP and ending with the sale to outsiders. See sec. 1.368-1(d)(5), Example 5, Income Tax Regs. Alternatively, respondent argues that, even if we decide that the transfer of the club's operation from 2618 to JKP qualified as either a "D" or "F" reorganization, petitioner must be deemed to be in receipt of the $40,011 total assets listed on the yearend balance sheet in Schedule L of 2618's 1989 return (the 1989 return balance sheet). Therefore, he is required to recognize that amount of long-term capital gain pursuant to section 356(a)(1)(B) and (2).

 B.  <u>Status of JKP's Acquisition of the Club as a "D" Reorganization</u>

  1.  <u>Statutory Requirements</u>

We find that the club was, in fact, owned and operated by 2618, not, as respondent suggests, by petitioner. The parties have stipulated that 2618 "is a corporation that owned and operated a topless dance club under the name of Caligula XXI". They have further stipulated that petitioner's management services and involvement in the operation of the club were pursuant to the March 16, 1987, agreement, which gave petitioner the right to "control and manage" the club's activities in consideration of "a management fee for said service." That

agreement was signed by Helmle both individually and as an officer of 2618. Consistent with that arrangement, 2618 paid petitioner $197,785 in 1989 and $90,630 in 1990. The parties stipulated that $84,689 for 1989, and $20,748 for 1990, was includable in petitioner's Schedule C income, and that the balance constituted 2618's repayment of money petitioner advanced to or paid on behalf of 2618. Also, the mixed beverage permit issued on September 20, 1988, and renewed on September 20, 1990, was issued to "Caligula XXI, 2618 Inc." Moreover, respondent's suggestion that petitioner operated the club on his own behalf rather than on behalf of 2618 is inconsistent with his position that petitioner was in receipt of constructive dividends from 2618 during the audit years. For all of the foregoing reasons, we find that 2618, not petitioner, transferred, to JKP, substantially all of the assets (either owned or leased from petitioner) associated with the operation of the club. On that basis, respondent concedes (and we hold) that the transfer of the club's operation from 2618 to JKP met the statutory requirements for a "D" reorganization.[14]

---

[14] Because we hold that the transfer of the club's operation from 2618 to JKP satisfied the statutory requirements for a "D" reorganization, we find it unnecessary to decide whether such transfer also satisfied the statutory requirements for an "F" reorganization.

## 2. Continuity of Business Enterprise

We also reject respondent's suggestion that JKP's January 1991 sale of its assets, less than 3 months after it acquired them, indicates that those assets were sold "as part of the overall plan to transfer the assets from 2618 to JKP". We have no doubt that petitioner's efforts on behalf of the club and his investment in 2618 were motivated principally, if not exclusively, by his desire to receive, in cash, the overdue legal fees from 2618 and Helmle. His ongoing efforts to secure the indispensable SOB and mixed beverage permits for the club were doubtlessly motivated by a desire to make the club a readily saleable property. But, as respondent acknowledges, there is no direct evidence that JKP's actual sale of its assets was part of an overall plan existing at the time of the transfer of the club's operation from 2618 to JKP; and we do not infer the existence of such a plan by reason of the proximity in time of the two transactions. The mere fact that petitioner may have contemplated selling the club at the time of its transfer from 2618 to JKP does not require a finding that such transfer lacked COBE. See Lewis v. Commissioner, 176 F.2d 646 (1st Cir. 1949), affg. 10 T.C. 1080 (1948). In that case, a corporation sold two of its three lines of business and, because it was temporarily unable to sell the third, it placed the assets of the remaining business in a new corporation, pending a sale (which occurred

less than 3 years later), and then liquidated.  Because the
transferee corporation continued to conduct the old business, the
Court sustained our finding that the transaction had a valid
business purpose and that it qualified as a nondivisive "D"
reorganization under the 1939 Code predecessor of section
368(a)(1)(D).  The Court distinguished cases in which the intent
was that the transferee corporation immediately make a
liquidating distribution of the assets received from the
transferor corporation, stating as follows:

> But in the present case, petitioners' plan contemplated
> that the new company would carry on the * * *
> business, and this was done.  Although petitioners'
> intention was to dispose of the * * * [business]
> eventually, the fact that a going business was
> transferred and operated left the new company and
> petitioners, its shareholders, in a position where they
> stood to gain or lose from operations just as before
> the transfer; if business conditions warranted it, the
> business could have been continued indefinitely.  [Id.
> at 649; emphasis added.]

We hold that the reasoning of the First Circuit Court of
Appeals in Lewis v. Commissioner, supra, applies to this case and
that the transfer of the club from 2618 to JKP possessed COBE.

C.  Existence of a Distribution Taxable Under Section 356(a)

Respondent argues that, even if 2618's transfer of the club
to JKP constituted a "D" reorganization, petitioner was
nevertheless in receipt of $40,011 of "boot" taxable as long-term

capital gain under section 356(a)(1)(B) and (2).[15]  That argument depends upon a finding that the $40,011 of assets listed on the 1989 return balance sheet continued to exist in November 1990, and were, in fact, distributed to petitioner at that time. Petitioner denies that he received any distribution from 2618 in connection with its transfer of the club to JKP.

Respondent simply states that the assets reflected on the 1989 return balance sheet "must have gone somewhere, and the only logical recipient would be the petitioner as the sole owner of the stock of * * * [2618]."  A more plausible argument (and a reasonable inference) is that such assets (assuming they still existed in November 1990) were transferred to JKP as part of 2618's transfer of the operation of the club.  That is certainly true with respect to such business-related assets as "inventories" (presumably consisting of food and liquor) ($4,175), current accounts receivable ($1,296), and "depreciable assets less accumulated depreciation" ($8,647) (an asset the very

---

[15]  As we have previously noted in discussing the constructive dividend issue (section II, supra), petitioner had a zero basis for his 2618 stock, and respondent concedes that 2618 was without earnings and profits on the date of the alleged distribution.  Under such circumstances, sec. 356(a)(1)(B) provides for gain recognition up to the "sum of * * * money and the fair market value of * * * property" distributed, and sec. 356(a)(2) provides that "the gain recognized * * * shall be treated as gain from the exchange of property."  Because petitioner's holding period for his 2618 stock exceeded 12 months as of November 1990, such gain would be long-term capital gain. See Gross v. Commissioner, 23 T.C. 756, 768 (1955), affd. 236 F.2d 612 (2d Cir. 1956).

existence of which is in doubt in light of 2618's lease of its furniture, furnishings, fixtures and all leasehold improvements from petitioner).  So-called "other assets", described on a schedule attached to the return as "FIT deposits" ($3,866) and "Bond Sales Tax" ($675), appear to be prepayments of anticipated liabilities that one would expect to continue for the benefit of JKP.  Even if all or a portion of the $21,352 in cash listed on the 1989 return balance sheet remained in November 1990, it is more likely to have gone to JKP in order to satisfy its current operating needs (the 1989 return balance sheet listed $17,490 in accounts payable and $10,633 in other short-term obligations) than to petitioner.

We find that respondent's speculation that the assets listed on the 1989 return balance sheet remained in existence and were distributed to petitioner some 10 months later is implausible, and we find, based upon the evidence before us (including petitioner's uncontradicted testimony), that petitioner received none of the assets listed on the 1989 return balance sheet in connection with the November 1990 transfer of the club from 2618 to JKP.  Therefore, we reject respondent's argument that petitioner was in receipt of a distribution taxable under section 356(a)(1)(B) and (2).

IV.  Schedule C Deductions

  A.  Parking Fees

Petitioner's alleged parking fees constituted cash payments for daily parking in downtown Houston parking lots.  They were incurred in connection with trips to court in pursuance of his litigation practice.  Respondent has denied petitioner's deduction of those fees for lack of substantiation.

Based upon petitioner's testimony that, during the audit years he "handled multiple cases * * * that required * * * [him] to come to court most every day downtown", we find that the downtown Houston courthouses in which he litigated constituted regular places of business.

It is well settled that the cost of commuting between one's residence and a regular place of business or employment is a nondeductible personal expense.  Commissioner v. Flowers, 326 U.S. 465, 473-474 (1946); sec. 1.162-2(e), Income Tax Regs.; sec. 1.262-1(b)(5), Income Tax Regs. Transportation expenses incurred on trips between places of business, however, may be deductible.  Steinhort v. Commissioner, 335 F.2d 496, 503-504 (5th Cir. 1964), affg. and remanding T.C. Memo. 1962-233.  Here, the record does not indicate which, if any, of petitioner's trips to court represented travel between his office and the courthouse or between courthouses, nor is any amount associated with such travel.  Under such circumstances, none of petitioner's trips to

court have been shown to be other than travel between his residence and court. Therefore, we hold that any parking fees incurred in connection with such travel constitute nondeductible commuting expenses. See Anderson v. Commissioner, 60 T.C. 834, 836 (1973).

Even if the parking fees were shown to be associated with deductible business trips, we agree with respondent that the deduction of such fees must be denied due to lack of substantiation. Petitioner failed to produce any receipts or other evidence that might have corroborated his oral testimony. Moreover, assuming arguendo that petitioner is not required to satisfy the substantiation requirements of section 274(d)(1) with respect to the parking fees, petitioner has failed to provide the minimal substantiation that would permit us to estimate the allowable deduction as permitted under Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). Even under Cohan, there must be sufficient evidence in the record to provide a basis upon which an estimate may be made. Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). Here, there is none. Petitioner's failure to offer any substantiation that would corroborate his oral testimony provides an additional basis for sustaining respondent's denial of the deduction for the parking fees. See Allied Marine Sys., Inc. v. Commissioner, T.C. Memo. 1997-101,

affd. sub nom. <u>Gibbons v. Commissioner</u>, 155 F.3d 558 (4th Cir. 1998).

    B.  <u>Bad Debt Deductions</u>

Petitioner alleges that he made a portion of the payments to TCB as guarantor of real estate construction loans to Payne & Potter, Inc., which, because of its insolvent state, was in default. Petitioner alleges that the bad debt deductions ($14,000 for 1989 and $8,000 for 1990) arose out of the worthlessness of his right of recoupment against Payne & Potter, Inc. Here again, respondent has denied the deductions for lack of substantiation.

The parties have stipulated that petitioner paid $34,443 in 1989 and $13,644 in 1990 to TCB. Petitioner alleges that he paid $14,000 in 1989 and $8,000 in 1990 to discharge his obligation as the guarantor of construction loans by TCB to Payne & Potter, Inc., which had become insolvent in 1986 and had defaulted on the loans. Because of his inability to recoup from Payne & Potter, Inc., the amount of those payments to TCB, petitioner claims that he is entitled to bad debt deductions of $14,000 and $8,000 for 1989 and 1990, respectively.

Petitioner has failed to corroborate his oral testimony with written evidence of any loan (or loans) by TCB to Payne & Potter, Inc., or of any agreement whereby he became the guarantor of such

loans.  Although petitioner testified that there was supporting documentation, he did not produce it.

Here, again, petitioner has failed to provide the required substantiation in support of his deductions.  Moreover, he has not shown that he made any effort to collect even a portion of the amount allegedly owed to him by Payne & Potter, Inc.  The mere fact of the debtor's insolvency does not prove that petitioner, as creditor, had no reasonable prospect of recovery, which is necessary to support a bad debt deduction.  See Intergraph Corp. & Subs. v. Commissioner, 106 T.C. 312, 323 (1996), affd. per curiam without published opinion 121 F.3d 723 (11th Cir. 1997).

For the foregoing reasons, we sustain respondent's determination disallowing petitioner's bad debt deductions.

V.  Section 6662(a) Penalty

Section 6662(a) provides for a penalty equal to 20 percent of the underpayment in tax attributable to, among other things, negligence or disregard of rules or regulations (without distinction, negligence).  See sec. 6662(b)(1).  The penalty for negligence will not apply to an underpayment in tax to the extent that the taxpayer can show both reasonable cause and that the taxpayer acted in good faith.  See sec. 6664(c)(1).  Negligence "includes any failure by the taxpayer * * * to substantiate items properly."  Sec. 1.6662-3(b)(1), Income Tax Regs.  Because

petitioner failed to substantiate to any degree the Schedule C deductions for parking fees and bad debts discussed in section IV, <u>supra</u>, we sustain the negligence penalty with respect to the underpayment attributable to respondent's denial of those deductions.  See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 449 (2001); see also <u>Perrah v. Commissioner</u>, T.C. Memo. 2002-283.

<u>Decision will be entered</u>

<u>under Rule 155</u>.