# United States Tax Court

T.C. Memo. 2025-30

WT ART PARTNERSHIP LP, LONICERA LLC,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 28440-15, 19604-16.                  Filed April 9, 2025.

————

*Mark J. Hyland*, *Thomas R. Hooper*, *Michael J. Watling*, and *Peter E. Pront*, for petitioner.

*Laurie A. Humphreys*, *Keith L. Gorman*, *John A. Guarnieri*, *Randall S. Trebat*, and *Audra D. Sharma*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*: Oscar Liu-Chen Tang is a prominent Chinese-born American businessman, investor, and philanthropist. For many decades he has been a generous supporter of the Metropolitan Museum of Art in New York City (Met). During the 1990s the Met was eager to enhance its collection of early Chinese paintings. Mr. Tang, who joined the Met's board of trustees in 1994, pledged to assist with this effort.

Curators at the Met expressed admiration for a group of early Chinese paintings owned by C.C. Wang, a New York art collector and dealer. In 1997 Mr. Tang paid $5 million to acquire 12 of these paintings through WT Art Partnership LP (WT Art). In April 1997 Mr. Tang and his family executed in favor of the Met a deed of promised gift covering 11 of the paintings. Mr. Tang's plan was to retain ownership of the paintings in WT Art for a period of time, expecting that they would

[*2] appreciate. Meanwhile, most or all of the paintings were exhibited at the Met on temporary or permanent loan from WT Art.

During 2010–2012 WT Art donated five of these paintings to the Met, reporting aggregate charitable contribution deductions in excess of $73 million. WT Art attached to its tax return for each year appraisals to substantiate the reported values of the paintings. All five appraisals were prepared by China Guardian Auction Co. Ltd. (China Guardian), which at the time was the second largest art auction house in China.

Upon examination of WT Art's 2010–2012 returns, the Internal Revenue Service (IRS or respondent) disallowed the charitable contribution deductions in their entirety. It determined that China Guardian was not a "qualified appraiser" and that WT Art had failed to attach to its return a "qualified appraisal," as required by section 170(f)(11)(D),[1] to substantiate gifts of property valued in excess of $500,000. In the alternative, the IRS determined that WT Art had overvalued the paintings.

After the docketed cases were consolidated in this Court, the parties reached agreement as to the fair market values (FMV) of four paintings. Following trial they have presented five questions for decision: (1) whether the appraisals attached to the returns were "qualified appraisals" by a "qualified appraiser"; (2) if not, whether that lapse is excused by section 170(f)(11)(A)(ii)(II), which provides that a deduction shall not be disallowed "if it is shown that the failure to meet [the qualified appraisal] requirements is due to reasonable cause and not to willful neglect"; (3) whether the FMV of *Palace Banquet*, the painting donated in 2010, was $26 million (as reported) or a lesser amount; (4) whether the value otherwise determined for *Palace Banquet* should be reduced by a discount for lack of marketability attributable to a "deaccession restriction" allegedly imposed on the Met;[2] and (5) whether various accuracy-related penalties apply.

We find that the appraisals prepared by China Guardian were not "qualified appraisals" because none of the individuals involved in

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rule of Practice and Procedure.

[2] The Met's Collection Policy defines the term "deaccession" to mean that "a work is removed from the collection and considered for disposal by sale, exchange or other means." A "deaccession restriction" would prevent it from selling the work.

[*3] preparing those documents was a "qualified appraiser." However, we hold that deductions are nevertheless allowable because the failure to secure qualified appraisals was "due to reasonable cause and not to willful neglect." *See* § 170(f)(11)(A)(ii)(II). We conclude that the FMV of *Palace Banquet* was $12 million, slightly above the figure determined by respondent's expert, and that no deaccession restriction encumbered this gift. Because the value claimed on WT Art's return exceeded the painting's correct value by more than 200%, it is liable for the 40% valuation misstatement penalty for tax year 2010. *See* § 6662(a), (h). We do not sustain the Commissioner's imposition of an accuracy-related penalty for tax year 2011 or 2012. *See* § 6662(a) and (b)(1) and (2).

FINDINGS OF FACT

The trial of these cases presented challenges attributable initially to the COVID pandemic and then to the difficulty of securing testimony from witnesses resident in China. We tried the case in three phases, beginning January 2021 and ending April 2023. The following facts are derived from the Pleadings, a Stipulation of Settled Issues, three Stipulations of Facts with attached Exhibits, and the testimony of fact and expert witnesses admitted into evidence at trial. WT Art is a Delaware partnership classified as a TEFRA partnership at all relevant times.[3] Petitioner, Lonicera LLC (Lonicera), is its tax matters partner (TMP).[4] WT Art had its principal place of business in New York when the Petition was timely filed.

I.     *Introduction*

Mr. Tang was born in Shanghai, China. In 1949 his family fled to Hong Kong and thence to the United States. He received an engineering degree from Yale University and an M.B.A. from Harvard Business School. He began his career at Donaldson, Lufkin & Jenrette, a New York brokerage house, where he was head of research. In 1970 he cofounded Reich & Tang, which became a highly successful investment management firm. He served as chief executive officer of Reich & Tang until 1993 and as a member of its board until 2000.

---

[3] Before its repeal, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit procedures for many partnerships, including WT Art.

[4] Although this Opinion addresses two consolidated cases, we will refer to "petitioner" in the singular because both cases involve the same partnership and TMP.

**[*4]**    Throughout his life Mr. Tang has demonstrated a commitment to philanthropy.  He has made generous contributions to, and occupied various positions with, numerous charitable and academic institutions. These include Phillips Academy at Andover (where he attended high school), the New York Philharmonic Orchestra, and the Met.  He joined the Met's Board in 1994 and served on it for 28 years.  He is currently chairman of the Met's Asian Art visiting committee and an emeritus trustee.

In 1956 Mr. Tang's sister married Wen Fong, a professor of Chinese art history at Princeton University.  During 1971–2000 Wen Fong also served as consultative chairman of the Met's Department of Asian Art.  In 2000 he was appointed the Douglas Dillon Curator Emeritus of Asian Art, a title he held until his death in 2018.  With assistance from Wen Fong, Mr. Tang developed a strong interest in early Chinese art. He followed the market for such paintings—particularly the Chinese market—avidly throughout his career.

II.    *The Met's Interest in Early Chinese Paintings*

Douglas Dillon became president of the Met in 1970, after serving as Secretary of the Treasury during the Kennedy administration.  Mr. Dillon sought to build up the Met's Asian collection, with a particular focus on Chinese paintings from the Song and Yuan Dynasties (spanning the 10th through the 14th centuries).  Paintings from these dynasties were rare and extremely valuable.

C.C. Wang, a preeminent connoisseur and collector of Chinese art, had an extensive collection of paintings from this period.  In 1973 Mr. Dillon purchased 25 paintings from C.C. Wang and subsequently donated them to the Met.  Wen Fong, Mr. Tang's brother-in-law, helped negotiate that acquisition.  C.C. Wang expressed the hope that other paintings he owned would eventually be included in the Met's collection.

In 1996 Maxwell Hearn was the curator of Chinese paintings at the Met.  With a view to further developing its collection, he created a "wish list" of paintings that might be acquired from C.C. Wang.  That list included the five paintings at issue in these cases: (1) *Palace Banquet*, (2) *Simple Retreat*, (3) *Lofty Virtue Reaching the Sky* (*Lofty Virtue*), (4) *Entering the Tiantai Mountains* (*Tiantai Mountains*), and (5) *Traveling Through Snow Covered Mountains* (*Snow Covered Mountains*).

Wen Fong again led negotiations with C.C. Wang on behalf of the Met.  The negotiation process included examination of the paintings in

[*5] the Met's laboratories, which enabled it to evaluate the condition of the artwork. The Met reported its findings in a "condition report" for each work. The condition report for *Palace Banquet* noted "many old repairs," "subsequent losses," "mounting deteriorat[ion]," and damage to the ivory roller knobs.

In early 1997 Wen Fong negotiated an arrangement whereby C.C. Wang expressed willingness to sell 12 early Chinese paintings for $5 million. These included the 5 paintings at issue in these cases and *Along the Riverbank*, a painting dated to the 10th century, which C.C. Wang believed to be one of "the very best painting[s]" in his collection.

In an agreement executed in April 1997 between the Met and the C.C. Wang Charitable Trust (Wang Trust Agreement), the parties expressed their understanding that the Met would "celebrate the expected gift of the [12] paintings" by mounting an exhibition of those works, together with other works owned or previously contributed by C.C. Wang. This exhibition was to be accompanied by a catalog prepared by Dr. Hearn and a scholarly essay by Wen Fong. The Met also agreed to name a gallery space the "C.C. Wang Family Gallery" and to name C.C. Wang an "honorary curator" of Chinese painting.

The Met prepared an "interdepartmental memorandum" dated May 9, 1997, which was addressed to the Met's executive director, general counsel, and Asian art curators. The memo attached a copy of the Wang Trust Agreement and explained what "the Museum is required to do" thereunder. The memo does not refer to, and the executed copy of the Wang Trust Agreement does not mention, any "deaccession restriction" affecting the paintings. The memo listed the conditions stated in the previous paragraph, all of which the Met fulfilled. In 1999 Dr. Hearn and Wen Fong published *Along the Riverbank: Chinese Paintings from the C.C. Wang Family Collection*, which included essays and descriptive narratives of the 12 paintings and other works collected by C.C. Wang.

III.    *WT Art's Acquisition of the Paintings*

After securing C.C. Wang's acquiescence to a $5 million purchase price, Wen Fong advised Mr. Tang that the 12 paintings were available for acquisition. Mr. Tang and his family agreed to acquire the paintings for eventual donation to the Met. But with a view to finessing the application of New York sales tax, the transaction was structured in a rather complicated way.

**[*6]**    The C.C. Wang Charitable Trust contributed the 12 paintings to WT Art, a partnership in which WT Art Corp., a corporation owned by the Trust, held a 100% interest. Mr. Tang then created Ardisia Holdings LLC (Ardisia) as the acquisition vehicle. Ardisia is owned by five charitable remainder trusts (Tang Family Trusts), the life beneficiaries of which were Mr. Tang and his four children. Under a Purchase and Assignment Agreement dated April 2, 1997, Ardisia purchased all the stock of WT Art Corp. from the C.C. Wang Charitable Trust for $5 million.

When the dust settled, the Tang Family Trusts ended up owning (through Ardisia) a 99% interest in WT Art, which owned the 12 paintings. The remaining 1% of WT Art was owned by Lonicera, its general partner and TMP. Ardisia in turn held a 99.5% ownership interest in Lonicera. In substance, therefore, the 12 paintings were beneficially owned by the Tang Family Trusts.

Mr. Tang understood that the $5 million purchase price represented a significant discount from the aggregate price that would have been paid to purchase the 12 paintings separately. WT Art allocated the $5 million purchase price among the paintings using its best estimate of their relative value. Half the purchase price (or $2.5 million) was allocated to *Along the Riverbank*, then regarded as the finest painting in the group. A cost of $250,000 was allocated to *Palace Banquet*, and an aggregate cost of $1.25 million was allocated to the other four paintings at issue in these cases.

In April 1997 Ardisia and the Tang Family Trusts executed in favor of the Met an Offer of Promised Gift covering 11 of the 12 paintings (including the five paintings at issue). This document indicated that "the gift of these works will be completed by the later of April 1, 2012," or the date of Mr. Tang's death. The document stated that "[t]hese works shall not be deaccessioned by the Museum."

By letter dated May 14, 1997, the Met expressed its appreciation to Mr. Tang and his family "for your promised gift of the 11 works of art." The letter indicated that "[t]his promised gift was reported to the Board of Trustees on May 13, 1997, and gratefully accepted at that time." The letter does not refer to any deaccession restriction. The record contains no evidence as to whether the board of trustees in 1997 considered the existence or effect of any deaccession restriction when accepting the Offer of Promised Gift.

[*7] IV.  *Initial Donations to the Met*

WT Art executed its first gifts to the Met during 2005–2008.  In deciding which (if any) paintings WT Art should donate in a particular year, Mr. Tang was assisted by Gwenn Winkhaus, who had been his accountant since 1992.  Mr. Tang and Ms. Winkhaus engaged in an annual planning exercise to estimate the magnitude of a charitable contribution deduction that could be efficiently used.  This exercise entailed four steps: (1) estimating the total taxable income for the Tang family; (2) obtaining preliminary "estimates of value" for several paintings; (3) determining which paintings to donate; and (4) obtaining appraisals of those paintings.

A.  *Donations in 2005*

In 2005 WT Art donated four works to the Met, including a 60% interest in *Tiantai Mountains*.  To support the values claimed for these contributions, WT Art secured, and attached to its 2005 tax return, an appraisal from Mitsuru Tajima, an art expert employed by London Gallery in Tokyo.  On the basis of discussions with Dr. Hearn and Wen Fong, Mr. Tang concluded that London Gallery was a reputable firm.  He also believed that using an appraisal firm based in Tokyo was logical because Japan was the second largest market for early Chinese art worldwide.

London Gallery concluded a value of $1.02 million for a 60% interest in *Tiantai Mountains* and an aggregate value of $1.7 million for the other three paintings.  The appraisal was two pages long.  By way of comparison it cited the sale of one Chinese painting—for $412,000 at a Christie's Hong Kong auction in May 2005.  Expressing the view that WT Art's four paintings were superior in quality, London Gallery concluded that they "could easily sell for three times" as much.

The IRS selected WT Art's 2005 return for examination.  The IRS did not challenge the status of London Gallery as a "qualified appraiser" or the nature of its work product as a "qualified appraisal."  But the IRS did dispute the valuations placed on the four paintings.

As a knowledgeable observer of the market for early Chinese paintings, Mr. Tang believed that the center of gravity for high-quality auctions was shifting to China.  He accordingly asked Wen Fong to recommend a Chinese firm that could supply backup appraisals to support the value conclusions London Gallery had reached.  Wen Fong recommended China Guardian, an auction house in Beijing.  Wen Fong had

[*8] previously sold a number of his own paintings at China Guardian auctions and was impressed with the quality of its work.

At that time China Guardian was the second largest auction house in China for fine art. During 2010–2012 it received annual fees in excess of $100 million for its auction services. It did not regularly perform appraisal services or hold itself out as a formal appraiser. As a service to its clients, however, it routinely provided estimates of the price at which a work of art might sell if offered at auction (often called a "reserve estimate" or "presale estimate"). Wang Yannan (Ms. Wang) was the president of China Guardian at all relevant times. She oversaw a large staff of professionals in its painting and calligraphy departments who specialized in authenticating early Chinese paintings and preparing them for auction.

Wen Fong contacted Ms. Wang and requested China Guardian's assistance with the IRS examination. He supplied descriptions of the four paintings in question, which Dr. Hearn had prepared using information in the Met's archives. Wen Fong asked China Guardian to provide their "expert's fair valuation of the current market worth[]" of the four paintings.

In preparing the appraisal, China Guardian followed a process that it would use in preparing all subsequent appraisals for WT Art. Ms. Winkhaus, Mr. Tang's accountant, drafted a cover letter or "template" to address the appraisal's compliance with the technical requirements for a "qualified appraisal." See Treas. Reg. § 1.170A-13(c)(3)(ii). Dr. Hearn provided photographs of the paintings and evaluations of their condition from the Met's conservation files. Wen Fong provided narrative descriptions from the Met's archives and suggested possible comparable sales, while China Guardian searched for others. Wen Fong offered his view as to the value of each painting, and the values China Guardian finally determined were usually fairly close to his estimates.

On June 22, 2009, China Guardian finalized its appraisals of the four paintings, and WT Art supplied the appraisals to the IRS team examining its 2005 return. Each appraisal consisted of the cover sheet and three pages of analysis. For each painting China Guardian provided a detailed description, a reference to any publications of the work, and one or two comparable transactions (generally auction sales at Christie's Hong Kong or mainland Chinese auction houses during 2005–2008). But China Guardian did not provide any analysis addressing the comparability of the paintings selected or how the auction prices were

[*9] adjusted to yield the appraised values. Ms. Wang, who was not herself an art expert, signed the appraisals as the president of China Guardian.

In May 2011 the IRS issued WT Art a Notice of Final Partnership Administrative Adjustment (FPAA) for 2005 that adjusted the aggregate reported values of the four paintings downward by $1.6 million, from $2.72 million to $1.12 million. WT Art petitioned this Court for review. *See WT Art Partnership LP v. Commissioner*, No. 17732-11 (T.C. filed July 29, 2011). The parties settled the case, and the Court entered a stipulated decision that allowed an aggregate charitable contribution deduction of $2.448 million, corresponding to 90% of the aggregate value WT Art had reported for the four paintings.

Mr. Tang regarded the outcome of the 2005 case as positive. He and his colleagues believed that China Guardian's backup appraisals were very helpful in negotiating a favorable settlement. His takeaway from the 2005 examination was that the IRS regarded China Guardian as a reputable company that produced reliable appraisals using Chinese auction house transactions as comparable sales.

B. *Donations During 2006–2008*

In 2006 and 2007 WT Art donated one painting to the Met (via gift of a partial interest in each year). To substantiate the value reported for this gift, WT Art again attached to its returns an appraisal by London Gallery in Tokyo. That appraisal resembled the document London Gallery had prepared previously: It was two pages long and cited one comparable sale from a Chinese auction house. This appraisal placed an aggregate value of $5.75 million on the artwork donated during 2006 and 2007. The IRS did not initiate an examination of WT Art's 2006 or 2007 return.

In 2008 WT Art donated one painting to the Met. To substantiate the value reported for this gift, WT Art attached to its return a June 23, 2009, appraisal by China Guardian that valued the artwork at $1.2 million. This appraisal resembled the backup appraisal that WT Art had secured from China Guardian during the 2005 IRS examination. It consisted of the "template" or cover sheet and two pages of analysis. The analysis provided a detailed description of the painting, a reference to its publication, and comparable prices drawn from auction sales during 2005–2008 at four Chinese auction houses. Ms. Wang again signed the

**[\*10]** appraisal as president of China Guardian. The IRS did not initiate an examination of WT Art's 2008 return.

## V. *The Donations at Issue*

### A. *2010 Donation*

In 2010 WT Art donated *Palace Banquet* to the Met. This painting is a large hanging scroll, executed on silk and painted in the "ruled-line" style. The ruled-line style features detailed renderings of architecture with ancillary elements divided into horizontal bands. The horizontal bands in *Palace Banquet* depict female figures performing various tasks throughout an ornate palace:



*Palace Banquet* is a large work. The image itself measures 64 inches by 44 inches; the overall dimensions (including mounting and roller knobs) are roughly 10 feet by 4 feet. Unsurprisingly for a work at least 750 years old, the painting shows signs of aging and damage. Some of the damage has been repaired, as indicated by visible evidence of restoration. The absence of an inscription, signature, or seals identifying

**[\*11]** prior owners has generated questions regarding provenance and accurate dating.

1.  *Appraisal by China Guardian*

Consistent with their prior practice, Wen Fong served as the primary contact between WT Art and China Guardian. London Gallery had supplied an $11 million "estimate of value" for *Palace Banquet* in 2007. Wen Fong initially suggested to Mr. Tang that "China Guardian will appraise [*Palace Banquet*] for app[roximately] $8m–$10m." Mr. Tang later indicated that the Tang Family Trusts would need at least $20 million in charitable contribution deductions for 2010.

On December 18, 2010, Wen Fong emailed China Guardian to request estimates of value for *Palace Banquet* and several other paintings that were being considered for donation to the Met, stating that Mr. Tang could "use more than a $20 million deduction this year." Two days later Ms. Wang provided the following estimates: (1) $26 million for *Palace Banquet*, (2) $10 million for *Lofty Virtue*, (3) $7.4 million for *Snow Covered Mountains*, and (4) $22 million for *Simple Retreat*. Her response did not explain how these values were determined.

The next day Mr. Tang asked Wen Fong why the estimate of value for *Palace Banquet* had "changed so much from 10 to 12 to now 26." He wondered whether $26 million is "what [Ms. Wang] is coming up with on her own?" At trial, referring to China Guardian's $26 million value estimate, Mr. Tang acknowledged that it "was a surprise that it was so high," noting his expectation that the valuation would be "about $11 million."

Wen Fong supplied China Guardian with a cover letter prepared by Ms. Winkhaus, which included one-sentence bullet points addressing satisfaction of the regulatory requirements for a qualified appraisal. *See* Treas. Reg. § 1.170A-13(c)(3)(ii). Wen Fong and Dr. Hearn supplied a description of *Palace Banquet* and a list of published references. They suggested as possible comparables two sales of Song Dynasty handscrolls, including *Sketches of Rare Birds* (*Rare Birds*), which sold at auction for $3.2 million in 2004.

On December 31, 2010, professionals at China Guardian informed Wen Fong that *Rare Birds* had recently been sold again at auction, this time for a higher price. They indicated that they would search for additional comparable sales using the Artron database, which reports results from Chinese auctions. Employing that database China

[*12] Guardian's professionals ascertained that *Rare Birds* had sold at auction for $9.36 million in May 2009. They regarded the sales of two other paintings as comparable transactions: *Han's Palace*, which reportedly sold at auction for $25.2 million in December 2010, and *Song Copy of Guo Zhongshu's Four Horsemen Hunting* (*Four Horsemen Hunting*), which sold at a China Guardian auction for $11.928 million in May 2010.

On January 4, 2011, China Guardian forwarded to Wen Fong a draft appraisal that valued *Palace Banquet* at $26 million. The appraisal incorporated the text previously supplied by Dr. Hearn and Wen Fong, and it cited as comparable sales the three transactions discussed in the previous paragraph. The draft did not include any analysis addressing the comparability of the four paintings. Nor did it include any text explaining how the auction prices listed in the previous paragraph were adjusted to yield a $26 million value for *Palace Banquet*.

Mr. Tang noted these shortcomings at the time, observing to Ms. Winkhaus that China Guardian had not "expressed their rationale" as to why the three cited paintings were comparable to *Palace Banquet*. He suggested that the appraisal needed "some text comparing this work to [the] auctioned works they list for comparables." China Guardian's draft appraisal for *Palace Banquet* was finalized on February 22, 2011, without any change. The appraisal was signed by Ms. Wang as president of China Guardian.

2.     *The Met's Acceptance of the Palace Banquet Gift*

On December 22, 2010, WT Art executed an Offer of Gift for *Palace Banquet*. This document stated that "[t]he foregoing gift shall include all of my right, title and interest to the above described property, and all rights of reproduction and publication, and shall not be subject to any condition or limitation." The Met's board of trustees acknowledged the gift by letter dated December 30, 2010. This letter made no reference to any "deaccession restriction" or other condition attached to the gift. The Met issued a subsequent letter acknowledging the contribution on January 20, 2011. This letter likewise made no reference to any "deaccession restriction" or other condition attached to the gift.

On December 23, 2010, Dr. Hearn prepared a "Report of Gift, Promised Gift, or Bequest" for *Palace Banquet*. A brief notation at the top described the donation as a "promised gift/donor restrictions/year end gift." Dr. Hearn found that the painting was "in reasonable condition considering its age," that it was "exhibitable," but that it "require[d]

[*13] conservation and a new mounting." The report noted "extensive in-painting where the original silk has been lost and [other] areas where the pigment is unstable and in danger of peeling off."

Dr. Hearn's report indicated that nothing was known about the painting's provenance, only that it had been acquired by C.C. Wang "long before 1970." The painting had no signature and no seals of prior collectors, other than the seal that C.C. Wang himself had affixed to memorialize his ownership.

Dr. Hearn's report placed a "curatorial value" of $30 million on *Palace Banquet*. At trial he could not recall how he determined this figure. But he noted that "curator's values" are used at the Met to quantify donors' "membership credit." Dr. Hearn acknowledged that he is not qualified to value artwork.

On January 11, 2011, the Met's trustees discussed the *Palace Banquet* donation at a board meeting. An excerpt from the minutes of that meeting stated that "[t]his work is offered subject to the restriction that it is not to be deaccessioned." The Met's Collection Policy stated that it "will honor any legal restriction, and even absent a binding legal obligation, it will not deaccession a work within 25 years of receiving it if the donor (or his representatives or heirs) objects."

In early 2011 the Shanghai Museum requested that the Met lend *Palace Banquet* and other pieces for an exhibition in China. In connection with a possible loan, Dr. Hearn in June 2011 placed a $50 million value on *Palace Banquet* when preparing an indemnification application to the U.S. Government. He determined this figure after speaking with other curators who were also considering lending artwork to the Shanghai Museum. At trial Dr. Hearn explained that the "indemnification value" reflected an estimate of how much it would cost to find a replacement work of art and was not indicative of *Palace Banquet*'s FMV. The Met ultimately decided that it could not lend *Palace Banquet* to the Shanghai Museum because the painting's fragile state made its transportation too risky.

B. *2011 and 2012 Donations*

In 2011 and 2012 WT Art donated to the Met the other four paintings at issue in these cases. China Guardian again supplied the appraisals, and the parties followed essentially the same procedure they had previously followed. Ms. Winkhaus prepared the cover letter or "template"; Dr. Hearn and Wen Fong supplied photographs and narrative

[*14] descriptions of the paintings, with suggested comparable sales; and China Guardian searched for additional sales and decided which transactions to use as comparables.

In December 2011 China Guardian provided estimates of value for *Snow Covered Mountains* ($11 million) and *Tiantai Mountains* ($15.8 million, corresponding to a 100% interest). Following its customary interchanges with Wen Fong, China Guardian in July 2012 supplied final appraisals of these works, with values identical to its estimates. It supported these values with four comparable sales transactions, all from Chinese auction houses. In 2011 WT Art donated *Snow Covered Mountains* to the Met, accompanied by a 40% interest in *Tiantai Mountains*. That 40% represented WT Art's remaining interest, a 60% interest having been donated in 2005. *See supra* p. 7.

In December 2012 China Guardian provided estimates of value for *Simple Retreat* ($24 million) and *Lofty Virtue* (a range of $9.6 million to $11.2 million). Its estimate of value for *Simple Retreat* was lower than its prior-year estimate. China Guardian attributed the decline to a downturn in the Chinese art market.

Following interchanges with Wen Fong and Dr. Hearn, China Guardian in August 2013 supplied final appraisals of *Lofty Virtue* and *Simple Retreat*. For *Lofty Virtue* it concluded a value between $8.16 million and $8.79 million; for *Simple Retreat* it concluded a value between $19.58 million and $24.48 million. It explained that these values were lower than its earlier estimates because of a further decline in the Chinese art market. China Guardian supported its final values with three comparable sales transactions from Chinese auction houses. WT Art donated *Simple Retreat* and *Lofty Virtue* to the Met in 2012.

WT Art executed Offers of Gift in favor of the Met for all four paintings. The documents executed in 2011 stated that the donations "shall include all rights of reproduction and publication, and shall not be subject to any condition or limitation." The documents executed in 2012 stated that "the Museum will have absolute and unconditional ownership of the Work" and that the gifts "will not be subject to any condition or limitation." As was true for the *Palace Banquet* gift, the Met issued acknowledgment letters that made no reference to any deaccession restriction. However, the minutes of the trustee meetings at which the gifts were discussed stated that "[t]hese works are offered subject to the restriction that they are not to be deaccessioned" and

[*15] indicated the trustees' approval of a "request for ratification of restrictive conditions."

VI. *Tax Returns and IRS Examination*

WT Art timely filed returns on Forms 1065, U.S. Return of Partnership Income, for 2010–2012. The returns, which were prepared by Ms. Winkhaus, claimed charitable contribution deductions for the five paintings consistent with the appraised values determined by China Guardian. For *Lofty Virtue* and *Simple Retreat*, for which China Guardian had determined a range of values, the 2012 return reported deductions at the midpoint of the range. For *Tiantai Mountains*, which represented the gift of a 40% interest, the reported value was 40% of the $15.8 million figure determined by China Guardian. The reported values for the five paintings were as follows:

| Painting | Year of Gift | 1997 Allocated Basis | Reported Value |
|---|---|---|---|
| Palace Banquet | 2010 | $250,000 | $26,000,000 |
| Tiantai Mountains (40%) | 2011 | 60,000 | 6,320,000 |
| Snow Covered Mountains | 2011 | 100,000 | 11,000,000 |
| Lofty Virtue | 2012 | 250,000 | 8,568,000 |
| Simple Retreat | 2012 | 750,000 | 22,032,000 |
| **Total** | | **$1,410,000** | **$73,920,000** |

The IRS selected all three returns for examination. In response to IRS questions about the existence of a "qualified appraisal," petitioner initially maintained that Ms. Wang was the "appraiser." Petitioner later acknowledged that three or four other professionals at China Guardian did the bulk of the work.

On August 13, 2015, and June 6, 2016, the IRS issued FPAAs for 2010 and 2011–2012, respectively. It denied the claimed charitable contribution deductions in their entirety, determining that WT Art had not established that all requirements of section 170 had been met. In the alternative it determined that WT Art had failed to establish that the values reported for the five paintings were correct. The FPAAs determined 40% accuracy-related penalties under section 6662(a) and (h) (applicable in the case of a "gross valuation misstatement") and (in the alternative) a 20% penalty under other provisions of section 6662.

[*16] Petitioner timely petitioned for readjustment of partnership items. It does not dispute (and the record establishes) that the IRS secured timely supervisory approval to assert all penalties determined in the FPAAs. *See* § 6751(b). On December 29, 2020, the parties filed a Stipulation of Settled Issues in which they agreed on the FMVs of the paintings donated in 2011 and 2012:

| Painting | Year of Gift | 1997 Allocated Basis | Reported Value | Agreed Value |
|---|---|---|---|---|
| *Tiantai Mountains* (40%) | 2011 | $60,000 | $6,320,000 | $4,500,000 |
| *Snow Covered Mountains* | 2011 | 100,000 | 11,000,000 | 9,500,000 |
| *Lofty Virtue* | 2012 | 250,000 | 8,568,000 | 7,500,000 |
| *Simple Retreat* | 2012 | 750,000 | 22,032,000 | 20,000,000 |
| **Total** | | **$1,160,000** | **$47,920,000** | **$41,500,000** |

VII.   *Trial*

A.    *Petitioner's Expert*

Petitioner called Wei Yang as its valuation expert at trial. Dr. Yang earned a Ph.D. in Chinese and Tibetan Art from Northwestern University. The Court recognized her as an expert in Chinese art.

Dr. Yang's report relied extensively on data from mainland Chinese art auctions. She acknowledged that concerns had been expressed about the reliability of the sale prices reported by some auction houses. But she did not detail any efforts she had undertaken to confirm the reported prices on which she relied. Rather, she made the "extraordinary assumption" that the reported sales data were reliable.

Dr. Yang concluded a value of $21 million for *Palace Banquet*. In reaching this conclusion she relied on the comparable sales method. In adjusting the sale prices of paintings she deemed comparable, she opined that it was appropriate to consider how those paintings compared to *Palace Banquet* in terms of (1) originality, (2) date of execution, (3) authorship, (4) rarity, (5) craftsmanship, (6) visual appeal, (7) condition, and (8) provenance.

Dr. Yang selected as comparable sales seven transactions consummated by mainland Chinese auction houses between 2008 and 2010. The seven paintings varied considerably in size, subject matter, and mounting (i.e., handscroll vs. hanging scroll). But Dr. Yang performed

**[*17]** an in-depth comparability analysis only between *Palace Banquet* and *Han's Palace.* The latter painting allegedly sold for $25.2 million at Beijing Poly International Auction Co. (Beijing Poly) in December 2010. Dr. Yang acknowledged that, as of April 2011, that price had been reported as not yet fully paid.

     B.    *Respondent's Experts*

     1.    *Patricia Graham*

Respondent offered expert testimony from Patricia Graham. Dr. Graham earned a master's degree in Asian Art History and a Ph.D. in Japanese Art from the University of Kansas. Her dissertation focused on Chinese influences on Japanese art. She is an accredited member of the Appraisal Association of America and is the author of its current examination for certification in Chinese and Japanese art. Since 1993 she has been called on to value art for museums, universities, insurance companies, auction houses, businesses, and private collectors. The Court recognized her as an expert in Chinese art.

Respondent retained Dr. Graham to provide an independent appraisal of *Palace Banquet* and to review China Guardian's appraisal. She noted that selecting comparables for *Palace Banquet* was difficult because paintings resembling it in scale, subject, and date of execution rarely appear in the market. She opined that dating *Palace Banquet* to the Northern Song Dynasty (960 to 1127), as proposed by petitioner and Dr. Yang, was unlikely. Considering "the material, state of preservation, brushwork, and motifs" appearing in *Palace Banquet*, Dr. Graham estimated a date of execution "somewhere between the late 10th and 12th century," most likely during the Southern Song Dynasty (1127 to 1279).

Dr. Graham concluded a value of $10 million for *Palace Banquet* without considering the effect of any deaccession restriction (which she did not believe she was qualified to assess). She relied chiefly on the comparable sales method. As comparables she selected four hand scrolls that were sold at Chinese auction houses during 2009 and 2010.

The prices paid for these works ranged between $6 million and $11.928 million. Two of the paintings were dated to the Southern Song Dynasty; one was likely earlier and the other slightly later. The highest price, $11.928 million, was paid for *Four Horsemen Hunting*, a 12th-century painting that Dr. Yang and China Guardian also regarded as comparable to *Palace Banquet*. Although these four works were unique

[*18] in their own ways, Dr. Graham regarded them as the best available comparables to *Palace Banquet* because of their dating, subject matter, and size.

Dr. Graham excluded from her comparability analysis several "record-setting sales," including the $25.2 million price allegedly paid in December 2010 for *Han's Palace*, on which China Guardian and Dr. Yang chiefly relied. Dr. Graham noted concerns about the reliability of sales data reported by Beijing Poly, where that painting was auctioned, observing that the reported $25.2 million price had not been fully paid as of April 30, 2011. She also pointed to what she regarded as significant differences between the two paintings. *Han's Palace*, for example, bore 26 imperial and collector seals and thus had an impressive historical provenance, whereas the provenance of *Palace Banquet* was obscure.

### 2. *Joseph Ruzicka*

Respondent offered expert testimony from Joseph Ruzicka. Dr. Ruzicka earned a Certificate of Curatorial Studies and a Ph.D. in Art History from New York University. He has more than 30 years of experience in the art world, having worked with Christie's auction house, the Met, the Museum of Modern Art in New York, and Artnet.com (a provider of online auctions and industry research). The Court recognized him as an industry expert regarding the conditions in the Chinese art market.

Dr. Ruzicka currently works for the IRS Art Appraisal Service as the subject matter expert for Asian art. He explained that, during the period surrounding WT Art's donation of *Palace Banquet*, market participants were sometimes skeptical about the published auction prices posted by mainland Chinese auction houses. In some cases the reported sales were never consummated, or they were consummated at prices substantially below the final auction bid. Yet auction houses often failed to adjust the published sale prices to reflect the actual payment terms (if payment was actually made).

Dr. Ruzicka's report attributed this phenomenon to idiosyncrasies in the Chinese auction market during that period. Fine art auctions in mainland China were relatively new, and auction houses sometimes did not authenticate artwork in advance of the auction. If the winning bidder later alleged that the painting was not authentic, he would refuse to pay or would negotiate a lower price.

**[\*19]** Chinese law at the time prohibited disclosure of the buyer's and the seller's identities. This enabled a seller to bid on his own property to drive up the price; if he was the high bidder, he could establish an artificially high "market price" for a work he continued to own. Apart from these irregularities, some winning bidders regarded the hammer price, not as a binding contractual obligation, but as the beginning of a negotiation with the auctioneer. All subsequent negotiation occurred behind closed doors; regardless of the outcome, the original hammer price usually continued to be shown as the final sale price.

Documentary evidence at trial supported Dr. Ruzicka's observations. The China Association of Auctioneers (CAA), established in 1995, is the only national association of art auction houses in China. CAA's statistical report for 2010 indicated that 408 transactions with sale prices exceeding 1 million renminbi (RMB) had occurred in that year. As of April 30, 2011, only 237 of those transactions, or 58% of the total, had been settled. CAA's statistical report for 2011 indicated that 581 transactions with sale prices exceeding 10 million RMB had occurred in 2011. As of April 30, 2012, only 261 of those transactions, or 45% of the total, had been settled. CAA's reports noted an increase in "some dishonest behaviors, including 'knowingly auctioning off fake goods,' 'fake auctions,' 'fake appraisals,' 'overcharging,' etc." Contemporary press reports—e.g., in the Wall St. Journal, Forbes, and BBC News—likewise noted problems with reported auction sales in China. These problems included nonpayment of winning bids, sales of fake artwork, fake bids, and sales used to pass bribes.[5]

3. *Michael Conroy*

Respondent offered expert testimony from Michael Conroy, who holds an M.B.A. from Southern Methodist University. He has more than 20 years of experience in consulting and valuation, specifically analyzing the impact on FMV of restrictions on marketability. The Court recognized him as an expert in the appraisal of assets subject to restriction or divided ownership.

Respondent asked Mr. Conroy to assume that WT Art's gift of *Palace Banquet* was encumbered by a legally valid deaccession restriction, and then to estimate the reduction in FMV attributable to this

---

[5] Through an arrangement sometimes called "elegant bribery," a person desiring a government benefit might give artwork of modest value to a government official. The official would offer the piece at auction, and the person soliciting the benefit would make an outlandishly high winning bid to acquire it.

[*20] restriction on the painting's marketability. He opined that the "monetary return from art is captured almost exclusively from price appreciation, since art does not produce interest or dividend payments for investors." He accordingly concluded that the Met's assumed inability to deaccession the painting reduced its FMV in the hands of the Met.

Mr. Conroy acknowledged that little if any authority exists about how to quantify a discount for lack of marketability attributable to a deaccession restriction affecting a museum. He offered three possible methodologies for this purpose—a discounted cashflow (DCF) model, a "closed form put option" model, and a Monte Carlo put option model. For purpose of running these models, which presuppose a finite period of time, he assumed deaccession restrictions running for 50, 75, and 100 years. On that basis he determined a discount for lack of marketability ranging from 26% to 31%.

## OPINION

### I.    *Burden of Proof*

The IRS's determinations in a Notice of Deficiency or an FPAA are generally presumed correct, though the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Among these conditions are that the taxpayer must have "introduce[d] credible evidence with respect to [that] factual issue," § 7491(a)(1), and must have "complied with the requirements under this title to substantiate any item," § 7491(a)(2)(A).

We need not decide who bears the burden of proof. Whether the burden has shifted matters only in the case of an evidentiary tie. *See Polack v. Commissioner*, 366 F.3d 608, 613 (8th Cir. 2004), *aff'g* T.C. Memo. 2002-145. In these cases we discerned no evidentiary tie on any material issue of fact. *See Payne v. Commissioner*, T.C. Memo. 2003-90, 85 T.C.M. (CCH) 1073, 1077 (finding "the assignment of burden of proof becomes irrelevant" in this situation). We thus decide all issues on the basis of the preponderance of the evidence.

**[\*21]** II.     *Availability of a Charitable Contribution Deduction*

    A.     *"Qualified Appraisal" Requirement*

Section 170(a)(1) allows as a deduction any charitable contribution made within the taxable year.  If the taxpayer donates property other than money, the amount of the contribution is generally equal to the FMV of the property at the time of the gift.  *See* Treas. Reg. § 1.170A-1(c)(1).  Where (as here) the taxpayer has donated property (other than publicly traded securities) valued in excess of $500,000, it must both obtain and attach to its return a "qualified appraisal of such property."  § 170(f)(11)(D).  An appraisal is "qualified" if it is "conducted by a qualified appraiser in accordance with generally accepted appraisal standards" and meets requirements set forth in "regulations or other guidance prescribed by the Secretary."  § 170(f)(11)(E)(i).

The statute provides that "the term 'qualified appraiser' means an individual" who has "earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum education and experience requirements set forth in the regulations prescribed by the Secretary."  § 170(f)(11)(E)(ii)(I).  The individual must "regularly perform[] appraisals for which the individual receives compensation" and must meet "such other requirements as may be prescribed by the Secretary in regulations or other guidance."  § 170(f)(11)(E)(ii)(II) and (III).  The individual must "demonstrate[] verifiable education and experience in valuing the type of property subject to the appraisal."  § 170(f)(11)(E)(iii)(I).

We find that neither China Guardian nor any of its employees involved in preparing the 2010–2012 appraisals were "qualified appraisers."  It is clear that China Guardian, as an entity, cannot be a "qualified appraiser."  The statute explicitly states that the term qualified appraiser "means an individual" who meets certain requirements.  § 170(f)(11)(E)(ii).

Each appraisal was signed by Ms. Wang as president of China Guardian.  As far as the record reveals, Ms. Wang was an executive officer and manager of the firm.  She did not testify at trial, and there is no evidence that she possessed "education and experience" in valuing ancient Chinese art.  *See* § 170(f)(11)(E)(iii)(I).  She therefore cannot be a "qualified appraiser."

Three or four employees ultimately supervised by Ms. Wang were involved in actual preparation of the appraisals.  Only one of these

**[\*22]** employees testified at trial, and she was a junior member of the team. She suggested that a senior member of the team may have had "education and experience" in valuing ancient Chinese art. But because that person did not testify, we cannot conclude that his or her education or experience was "verifiable." *See* § 170(f)(11)(E)(iii)(I).

Finally, a person can be a qualified appraiser only if "[t]he individual either holds himself or herself out to the public as an appraiser or performs appraisals on a regular basis." Treas. Reg. § 1.170A-13(c)(5)(i)(A). China Guardian is an auction house. As a service to its clients, it provided estimates of the price at which artwork might sell if offered at auction (often called a "reserve estimate" or "presale estimate"). These sorts of estimates are not "appraisals." There is no evidence that China Guardian or any of its staff regularly performed appraisal services or held themselves out to the public as appraisers. Indeed, as far as the record reveals, the appraisals China Guardian performed for WT Art were the only appraisals it performed for compensation during 2010–2012.

In sum, we conclude that the documents China Guardian prepared for WT Art were not "qualified appraisals" because they were not prepared by a "qualified appraiser." *See* § 170(f)(11)(E)(i) and (ii). We therefore need not reach respondent's arguments that the appraisals had substantive defects (authorship apart) that prevented them from being "qualified."

B. *"Reasonable Cause" Exception*

As a rule, failure to secure a qualified appraisal precludes a charitable contribution deduction. *See* § 170(f)(11)(A)(i), (D) (providing that "no deduction shall be allowed" unless specified substantiation requirements are met). However, Congress created an exception to this rule in section 170(f)(11)(A)(ii)(II). It provides that a charitable contribution deduction will not be disallowed if "it is shown that the failure to meet such requirements is due to reasonable cause and not to willful neglect." § 170(f)(11)(A)(ii)(II); *Belair Woods, LLC v. Commissioner*, T.C. Memo. 2018-159, 116 T.C.M. (CCH) 325, 330.

We have construed section 170(f)(11)(A)(ii)(II) similarly to other Code provisions that provide for "reasonable cause" defenses. *See Presley v. Commissioner*, T.C. Memo. 2018-171, 116 T.C.M. (CCH) 387, 402, *aff'd*, 790 F. App'x 914 (10th Cir. 2019); *Belair Woods*, 116 T.C.M. (CCH) at 330; *Crimi v. Commissioner*, T.C. Memo. 2013-51, 105 T.C.M. (CCH)

**[\*23]** 1330, 1353. "Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item." *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); *see Crimi*, 105 T.C.M. (CCH) at 1353 (citing *United States v. Boyle*, 469 U.S. 241 (1985)).

"The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1); *see Higbee v. Commissioner*, 116 T.C. 438, 449 (2001); *Sampson v. Commissioner*, T.C. Memo. 2013-212, 106 T.C.M. (CCH) 276, 280 (interpreting the term "good faith" to mean an honest belief and intent to perform all lawful obligations). In deciding whether WT Art had "reasonable cause," we analyze the situation from the standpoint of Mr. Tang, who exercised effective control over WT Art. *Cf. Superior Trading, LLC v. Commissioner*, 137 T.C. 70, 91–92 (2011) (examining the actions of the managing partner in determining whether the partnership had reasonable cause (citing *New Millenium Trading, L.L.C. v. Commissioner*, 131 T.C. 275 (2008))), *supplemented by* T.C. Memo. 2012-110, *aff'd*, 728 F.3d 676 (7th Cir. 2013); *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at \*45–46, *supplemented by* T.C. Memo. 2024-73.

Evaluating all the facts and circumstances, we find that Mr. Tang entertained a good-faith belief that China Guardian was a reputable firm whose appraisals were acceptable to the IRS. In 2005 WT Art donated four paintings to the Met and secured an appraisal from London Gallery to support the values claimed. The IRS selected this return for examination and disputed the valuations placed on the four paintings. Significantly in our view, the IRS exam team did not challenge London Gallery's status as a "qualified appraiser" or the nature of its work product as a "qualified appraisal."

Mr. Tang concluded that it would be desirable to secure additional appraisals to support the value conclusions London Gallery had reached. As a knowledgeable observer of the market for early Chinese paintings, he believed that the center of gravity for high-quality auctions was shifting to China. He accordingly asked Wen Fong to recommend a Chinese firm that could supply backup appraisals.

Wen Fong was a professor of Chinese art history at Princeton University. In 2005 he was the Douglas Dillon Curator Emeritus of Asian Art at the Met, having previously served as consultative chairman of its

[*24] Asian Art Department. Wen Fong had extensive personal experience with China Guardian and recommended it to Mr. Tang. Given Wen Fong's credentials and experience, Mr. Tang cannot be faulted for selecting China Guardian to supply backup appraisals.

The preparation of these initial appraisals established the process that WT Art subsequently followed. Dr. Hearn, the curator of Chinese paintings at the Met, prepared narrative descriptions of the four paintings drawn from materials in the Met's archives. He prepared evaluations of the paintings' condition, based on information in the Met's conservation files. This information, together with photographs of the four paintings and suggestions about comparable sales, was supplied to China Guardian. Given Dr. Hearn's credentials and experience, Mr. Tang reasonably believed that China Guardian was provided the information it needed to prepare a competent appraisal.

China Guardian prepared backup appraisals, and WT Art supplied them to the IRS exam team. The appraisals consisted of a cover sheet and three pages of analysis. The analysis included a detailed description of each painting, a list of publication references, and one or two comparable sales from Chinese auction houses. At no point during the 2005 examination did the exam team suggest that China Guardian was not a "qualified appraiser."

Eventually the parties reached a settlement that Mr. Tang described as involving "very little change." The record establishes that the IRS ultimately allowed a charitable contribution deduction corresponding to 90% of the aggregate value WT Art had reported on its 2005 return. Mr. Tang attributed the "smooth settlement" of that case to China Guardian's backup appraisals. He inferred that the IRS regarded China Guardian as a reputable company that produced reliable appraisals using Chinese auction house sales data.

During 2006–2008 WT Art donated two additional paintings to the Met, securing appraisals from London Gallery and China Guardian, respectively. China Guardian's appraisal resembled the backup appraisal it had prepared for use during the 2005 IRS examination, including comparable prices drawn from auction sales during 2005–2008 at four Chinese auction houses. The IRS did not initiate an examination of WT Art's 2006, 2007, or 2008 return.

When the time came to hire an appraiser for the 2010–2012 gifts, Mr. Tang again turned to China Guardian. The 2010–2012 appraisals

**[\*25]** were prepared following the same process that WT Art and China Guardian had used previously. Dr. Hearn and Wen Fong supplied photographs, narrative descriptions of the paintings, conservation reports about their condition, and potential comparable sales. China Guardian searched for additional sales transactions and determined which transactions to use as comparables.

Mr. Tang had no expertise in tax law, and he had no knowledge of the technical regulatory requirements regarding who could be a "qualified appraiser." *See* Treas. Reg. § 1.6664-4(b)(1). But he did know the following. China Guardian was recommended to him by Wen Fong, an expert in Chinese art. Crucial information about the paintings was supplied to China Guardian by Dr. Hearn, another expert in Chinese art. At no point during the 2005 examination did the examining agents suggest that either China Guardian or London Gallery failed to meet the requirements for a "qualified appraiser." And Mr. Tang's takeaway from the ultimate resolution of the 2005 examination was that the IRS regarded China Guardian as a reputable company that produced reliable appraisals using Chinese auction house transactions as comparable sales.

We have previously recognized that a taxpayer's past experience with the IRS may form the basis for a reasonable cause defense. *See Hugh Smith, Inc. v. Commissioner*, 8 T.C. 660, 676–78 (1947), *aff'd per curiam*, 173 F.2d 224 (6th Cir. 1949); *see also Haynes v. Commissioner*, T.C. Memo. 1990-135, 59 T.C.M. 107, 108; *Brown v. Commissioner*, T.C. Memo. 1989-89, 56 T.C.M. (CCH) 1388, 1390–91 (finding it reasonable for the taxpayer to rely on inferences drawn from past dealings with the Commissioner's agents), *aff'd in part, vacated in part, and remanded in part*, 916 F.2d 710 (4th Cir. 1990) (unpublished table decision); *cf. H. Fort Flowers Found., Inc. v. Commissioner*, 72 T.C. 399, 410–11 (1979) (finding it reasonable for a taxpayer to rely on a letter from an examining agent).

Evaluating all the facts and circumstances, we find that WT Art had "reasonable cause" to believe that appraisals prepared by China Guardian would comply with all applicable reporting and substantiation requirements. Even if we were to accept respondent's argument that the appraisals had substantive deficiencies (authorship apart), we would still find that the reasonable cause exception applies. WT Art's failure to secure qualified appraisals is thus not fatal to the allowance of charitable contribution deductions.

**[\*26]** III.    *Valuation*

A.    *Valuation Principles*

The allowable deduction for a charitable contribution of property is generally the FMV of the property on the date it is contributed. Treas. Reg. § 1.170A-1(a), (c)(1). The regulations define FMV as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Id.* para. (c)(2). Valuation is not a precise science, and the value of property on a given date is a question of fact to be resolved on the basis of the entire record. *See Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).

To support their respective positions on the value of *Palace Banquet*, the parties retained experts who testified at trial. We assess an expert's opinion in the light of his or her qualifications and the evidence in the record. *See Parker v. Commissioner*, 86 T.C. 547, 561 (1986). When experts offer competing opinions, we weigh them by examining the factors the experts considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962).

We are not bound by an expert opinion that we find contrary to our judgment. *Parker*, 86 T.C. at 561. We may accept an expert's opinion in toto or accept aspects of his or her testimony that we find reliable. *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 333–40 (2011) (rejecting expert opinion that disregards relevant facts). And we may determine FMV from our own examination of the record evidence. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

We typically consider one of three approaches to determine the FMV of property: (1) the market approach, (2) the income approach, and (3) an asset-based approach. *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). The parties agree that *Palace Banquet* should be valued by using the market approach.

The market approach—often called the "comparable sales" method—determines FMV by considering the sale prices realized for similar properties sold in arm's-length transactions reasonably near the valuation date. *See Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987); *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C.

[*27] 1, 19 (1979). Because no two properties are ever identical, the appraiser must make adjustments to account for differences between the properties (e.g., age, author, format, subject matter, and provenance) and terms of the comparable sales (e.g., proximity to valuation date and conditions of sale). *See, e.g.*, *Wolfsen Land & Cattle Co.*, 72 T.C. at 19. The solidity of an appraiser's valuation "depends to a great extent upon the comparables selected and the reasonableness of the adjustments made." *Id.* at 19–20.

B.    *Valuation of Palace Banquet*

1.    *Preliminary Considerations*

As Dr. Yang and Dr. Graham agreed, *Palace Banquet* is quite difficult to value. First, it is a very old work. Dr. Yang dated the painting from the 10th to the mid-11th century. Dr. Graham, citing some recent scholarship, believed it could be have been created somewhat later, possibly as late as the mid-12th century. Regardless of the painting's exact age, Chinese paintings this old rarely come to market, so there are relatively few comparable sales.

Second, the ruled-line style of *Palace Banquet* is somewhat unusual, which further complicated the search for comparable transactions. Neither expert located any sale, during the relevant timeframe, of a ruled-line painting from the 10th through the 13th century. Thus, the experts necessarily had to consider, as possible comparables, sales of ancient Chinese paintings in other genres, such as "bird and flower," "men on horseback," and "men hunting."

Third, many sales of ancient Chinese paintings occurred at auctions in mainland China, and mainland auction prices around 2010 were sometimes unreliable. Dr. Graham summarizes these problems in her report, and Dr. Ruzicka devotes his entire report to this problem. Dr. Yang admits in her rebuttal report that these problems existed and were widespread.

During 2010–2012 the CAA published annual data summarizing auction sales and indicating whether the sale price had been "fully paid" or was still "in process." These reports were published by calendar year, but the auction houses had until April 30 of the following year to submit data. Thus, if a 2010 sale was reported as still being "in process," that meant the sale price had not been fully paid by April 30, 2011.

**[*28]** CAA's statistical report for 2010 indicated that 408 transactions with sale prices exceeding 1 million RMB had occurred in that year. As of April 30, 2011, only 237 of those transactions, or 58% of the total, had been fully paid. CAA's statistical report for 2011 indicated that only 45% of transactions with sale prices exceeding 10 million RMB had been fully paid as of April 30, 2012. These data indicate that the reported auction prices for expensive works were sometimes unreliable.

### 2.    *Determination of FMV*

Dr. Yang determined a value of $21 million for *Palace Banquet* as of the contribution date. She identified as possible comparable sales the auction prices reported for seven paintings dated to various periods between the 11th and 14th centuries. The prices reported for these paintings ranged from $3,528,000 to $25,200,000. Dr. Graham selected four of the same paintings as potential comparables, and we will accordingly focus our attention on these four works. The four works are as follows (where the two experts use different names for the paintings, we provide both):[6]

| *Name* | *Date* | *Auction House* | *Price* |
|---|---|---|---|
| *Han's Palace* | 12/04/2010 | Beijing Poly | $25,200,000 |
| *Men on Horses/Four Horsemen Hunting* | 05/15/2010 | China Guardian | 11,928,000 |
| *Flowers and Bird/Rare Birds* | 05/29/2009 | Beijing Poly | 9,256,800 |
| *Painting by Ren Renfa/Five Drunken Kings Return* | 11/29/2009 | Christie's Hong Kong | 6,010,322 |

Although Dr. Yang identifies seven possible comparable transactions, her report focuses exclusively on *Han's Palace*—the highest priced sale—for a detailed side-by-side comparison with *Palace Banquet*. She characterizes her second, third, and fourth comparables (priced between $6 million and $11.928 million) "as close value indicators for *Palace Banquet*" and as "exquisite works in their own right." But she regards them as "modest in scale, simple or limited in iconography, less demanding in skill, technique, and the painter's knowledge of the imperial female subjects and painter's command of the pictorial space."

---

[6] For the third and fourth paintings shown in the table, Dr. Graham and Dr. Yang used different RMB/dollar conversion rates when reporting the prices paid. We show the higher price in each case.

**[\*29]** We think Dr. Yang did not sufficiently explain her rationale for placing so little weight on these other paintings. In characterizing them as "modest in scale," "simple in iconography," and showing less knowledge of "imperial female subjects," Dr. Yang appears to critique them as fundamentally different from *Palace Banquet*, a very large ruled-line painting, which depicts imperial female subjects performing various tasks. As noted above, however, there were no sales during 2010–2012 of large-scale, ruled-line paintings from the 10th to the 13th century. We thus agree with Dr. Graham that it is necessary to consider works in other genres as possible comparables.

*Han's Palace*—the focus of Dr. Yang's report—was reportedly sold by Beijing Poly in December 2010 for $25.2 million. As of April 30, 2011, however, CAA acknowledged that the reported purchase price had not been fully paid. This was not uncommon for auctions that Beijing Poly conducted that year. Figures cited by respondent's experts show that, for works Beijing Poly reportedly sold for $1.5 million or more in 2010, approximately 40% were not fully paid as of April 30, 2011.

As Dr. Yang observes, *Han's Palace* sold for just over $2 million in 2002. The reported price in December 2010 would thus represent a price increase of almost 1,300% in eight years. Dr. Yang's decision to focus exclusively on the highest priced work, despite some indications that this price might not be reliable, raises a question about the soundness of her approach.

The manner in which Dr. Yang conducts her side-by-side comparison between *Palace Banquet* and *Han's Palace* also raises questions, both about methodology and execution. Her report sets forth "Criteria for Ranking Traditional Chinese Painting" on a 100-point scale. She identifies on page 13 of her report six factors, to each of which she accords ten points: originality, date, authorship, visual appeal, condition, and provenance. She then identifies two factors to each of which she accords 20 points: rarity and craftsmanship/quality. She cites no appraisal literature or scholarly authority for this 100-point scale but seems to have created it for purposes of these cases.

Evaluating the two paintings side by side using this 100-point scale, Dr. Yang gave scores of 83 and 88 to *Palace Banquet* and *Han's Palace*, respectively. Because she scored *Palace Banquet* slightly lower, she appears to have adjusted the $25.2 million price reported for *Han's Palace* down by $4 million to arrive at a $21 million FMV for *Palace Banquet*.

[*30] Wholly apart from the lack of support for her 100-point scale, we find Dr. Yang's approach unpersuasive for several reasons. First, she undertook no side-by-side comparison between *Palace Banquet* and any of the other six paintings she identified as comparable. Logically one would have expected this: Even if those works were of lower value, as she opined, she could have evaluated them using her 100-point scale and then adjusted those sale prices up, just as she adjusted the sale price for *Han's Palace* down. Appraisers employing the comparable sales method routinely do this.

Second, Dr. Yang did not implement her analysis consistently. The side-by-side comparison at pages 58–59 of her report uses factors different from those she identified on page 13. "Visual appeal" has disappeared as a 10-point factor. "Provenance" has also disappeared as a distinct 10-point factor and has been lumped into "authorship." This makes little sense because the two concepts are different: Authorship refers to the person who created the work, whereas provenance refers to ownership of the work during the centuries after it was created.

In place of "visual appeal" and "provenance," Dr. Yang substitutes a different factor, "publicity." She does not list "publicity" as a relevant factor in her schema on page 13. Nor does she explain why "publicity" should merit as much weight in assessing a painting's value as (say) its date of creation or authorship.

To get back to 100 points, Dr. Yang at pages 58–59 of her report doubles the weight she gives to "condition." She does not explain why she does this. And doing so seems odd, since she admits that "no information is available on the condition" of *Han's Palace.*

Apart from these major problems, we note some additional flaws in Dr. Yang's analysis, even if one were to accept her 100-point scale methodology:

- Dr. Yang's removal of "provenance" as a distinct factor affecting value is highly questionable. As Dr. Graham explained, collectors of ancient Chinese art value the fact that paintings were owned by emperors and imperial officials many centuries ago. And good provenance is important to auction buyers, who might otherwise worry about forgeries. *Palace Banquet* has obscure provenance: No one knows who owned it before 1972, when C.C. Wang reported his ownership, and it would seem to merit a low score for "provenance." *Han's Palace*, by contrast, bore 26 imperial and

**[\*31]** collector seals and thus had an impressive historical provenance. By eliminating this factor, which would have affected the grade for *Palace Banquet* very negatively, Dr. Yang has artificially inflated its comparative score.

- The score Dr. Yang gave *Palace Banquet* for "publicity"—assuming arguendo that it is a useful factor at all—seems highly inflated. Noting that *Han's Palace* "appears in [an] imperial catalog of the 18th century and earlier secondary scholarship," she graded it nine out of ten for "publicity." But she graded *Palace Banquet* only one point lower, at eight out of ten, even though no one in the art world (apart from C.C. Wang) knew of its existence until 1972. Under the caption "Publications and Publicity," Dr. Yang lists only eight sources that mention *Palace Banquet*. Three are recent publications by the Met or its curators and two appear to be coffee-table books.

- The score Dr. Yang gave *Palace Banquet* for "condition" also seems inflated. She rates its condition as "good" despite the various flaws noted in the Met's condition reports. *See supra* pp. 5, 12–13. The Met's refusal to allow the painting to travel to a foreign exhibition suggests that its condition was quite fragile. Dr. Graham's assessment of its condition as "fair" seems more persuasive for the reasons she gives. In any event, it seems irrational for Dr. Yang to have double-weighted this factor, having it account for 20% of the total score, when there is absolutely no information about the condition of *Han's Palace*, the supposed comparable.

- Dr. Yang's conclusion is heavily influenced by her belief that *Palace Banquet* should be dated no later than the mid-11th century. The most recent scholarship, however—embodied in a Ph.D. dissertation by Zoe Kwok, a scholar at Princeton—makes the case for dating it to the mid-12th century, on the basis of archaeological evidence that items depicted in the painting belong to a later period. Dr. Yang's report acknowledges this dissertation, but she cites no scholarship disputing Dr. Kwok's thesis or the evidence on which Dr. Kwok relied.

For all these reasons we are unpersuaded by Dr. Yang's report. We find the conclusion inescapable that she set out to reach a very high value, so she worked exclusively off the highest priced sale, despite indications that the sale price might be questionable. And she appears to

[*32] have massaged her own scoring system to make *Palace Banquet* appear, by comparison, in an artificially bright light.

Dr. Graham determined a value of $10 million for *Palace Banquet* as of the contribution date. In reaching this conclusion, she reasonably gave reduced weight to the "record-setting" sale price that Beijing Poly reported for *Han's Palace* in December 2010. That price had not been fully paid as of April 30, 2011, and it represented almost a 1,300% increase over the sale price reported eight years previously. With these warning signs, Dr. Graham properly declined to treat this sale as supplying the sole or primary index of value.

Dr. Graham selected four comparable sales that ranged in price from about $6 million to $11.928 million. Dr. Yang identified three of the same paintings as comparable, and she acknowledged that the paintings commanding the two highest prices were "close value indications for *Palace Banquet*." One transaction was consummated at Christie's Hong Kong, whose reported auction prices were generally unquestioned. And Dr. Graham had evidence that the other three reported prices were also genuine, either because the buyer's identity was known (a museum) or because CAA data showed that the hammer price had been "paid in full."

In concluding a value of $10 million for *Palace Banquet,* Dr. Graham gave greatest weight to *Four Horsemen Hunting*, which sold for $11.928 million at China Guardian in May 2010. This handscroll, a well-known work, is a copy of a painting by Guo Zhongshu, a painter and scholar who worked during the Five Dynasties or Northern Song period. Although the artist is unknown—the same is true for *Palace Banquet*—Dr. Graham noted that *Four Horsemen Hunting* has been "classified as 'a grade one cultural relic of the state,' which is the highest category of cultural relics." It has an extensive provenance record that includes the catalog of the Qing imperial collection.

We think Dr. Graham properly regarded *Four Horsemen Hunting* as the best available comparable to *Palace Banquet*. Although *Palace Banquet* had inferior provenance, Dr. Graham acknowledged that it was a work of "first-rate quality" that had other attractive attributes. There was "general scholarly acceptance of its extreme age, fine execution, and interesting/rare subject matter." Its ruled-line style was somewhat unique, and it "would have been fresh to the market in 2010."

**[\*33]** We place some weight on the fact that Wen Fong and Mr. Tang—both knowledgeable observers of the market for ancient Chinese art—anticipated that *Palace Banquet* would be appraised somewhere between $10 million and $12 million. *See supra* pp. 7–8, 11. At trial, referring to China Guardian's $26 million value estimate, Mr. Tang acknowledged that it "was a surprise that it was so high," noting his expectation that the valuation would be "about $11 million."

What obviously caused China Guardian's appraisal to spike to $26 million was the reported sale of *Han's Palace* for $25.2 million at Beijing Poly in December 2010. As we have explained, we do not think that transaction justified the uplift, both because the price actually paid was unconfirmed and because Dr. Yang's comparability analysis between *Han's Palace* and *Palace Banquet* was flawed. Evaluating the evidence as a whole, and placing greatest weight on the sale of *Four Horsemen Hunting* for $11.928 million in May 2010, we find that the FMV of *Palace Banquet* on the contribution date was $12 million, before considering the effect of any deaccession restriction.

The parties have reached agreement concerning the FMV of the four paintings donated during 2011 and 2012. Because WT Art had reasonable cause for failing to secure qualified appraisals for these gifts, it is entitled to charitable contribution deductions in the aggregate amount of $14 million for the works donated in 2011 and $27.5 million for the works donated in 2012. *See supra* p. 16.

IV.   *Discount for Lack of Marketability*

Respondent contends that WT Art's gift of *Palace Banquet* was subject to a "deaccession restriction" that reduced its value in the hands of the Met. To quantify the alleged reduction in value respondent secured expert testimony from Mr. Conroy. He was instructed to assume, for purposes of his report, that a legally binding deaccession restriction had been imposed on the painting. He was then tasked with calculating a "discount for lack of marketability" that reflected this restriction.

Mr. Conroy acknowledged that he had never before undertaken such a task. And he admitted that he had discovered no authority—in accounting or appraisal guidelines, IRS pronouncements, or judicial precedent—about the appropriate methodology for valuing a deaccession restriction on artwork donated to a museum. He offered three methodologies for this purpose: (1) a DCF model, (2) a "closed form put option" model, and (3) a Monte Carlo put option model. Using these

**[*34]** models, which presupposed a deaccession restriction lasting 50–100 years, he determined a discount for lack of marketability ranging from 26% to 31%.

There was conflicting evidence at trial as to whether a deaccession restriction actually existed. The strongest evidence, we think, is the document by which WT Art transferred *Palace Banquet* to the Met. On December 22, 2010, WT Art executed an Offer of Gift for the painting. This document stated that "[t]he foregoing gift shall include all of my right, title and interest to the above described property, and all rights of reproduction and publication, and shall not be subject to any condition or limitation." The Met's board of trustees acknowledged the gift by letter dated December 30, 2010. This letter made no reference to any "deaccession restriction" or other condition attached to the gift. The Met issued a subsequent letter acknowledging the contribution on January 20, 2011. This letter likewise made no reference to any "deaccession restriction" or other condition attached to the gift.

The Offer of Gift, coupled with the Met's acceptance of the gift, constituted a legally binding contract under New York law.[7] Where contractual terms are clear and unambiguous, we give effect to its plain terms, as set forth within the four corners of the contract. *See Duane Reade, Inc. v. Cardtronics, LP*, 780 N.E. 2d 166, 170 (N.Y. App. Div. 2008) (first citing *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002); and then citing *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)). Nothing in the Offer of Gift suggests any intention by WT Art to impose on the Met a legally binding deaccession restriction with respect to *Palace Banquet*.

The manner in which the 2011 and 2012 contributions were made points to a similar conclusion. WT Art executed Offers of Gift in favor of the Met for the four paintings donated in those years. The documents executed in 2011 stated that the donations "shall include all rights of reproduction and publication, and shall not be subject to any condition

---

[7] *See I & I Holding Corp. v. Gainsburg*, 12 N.E.2d 532, 534 (N.Y. 1938) (holding that a charitable pledge constitutes a unilateral contract, which becomes a binding obligation when relied upon by the charity); *In re Kramer*, 30 N.Y.S.3d 903, 904 (App. Div. 2016); *Woodmere Acad. v. Steinberg*, 385 N.Y.S.2d 549, 552 (App. Div. 1976) (citing *Cohoes Mem'l Hosp. v. Mossey*, 266 N.Y.S.2d 501, 502 (App. Div. 1966)), *aff'd*, 363 N.E.2d 1169 (N.Y. 1977); *cf. Silber v. N.Y. Life Ins. Co.*, 938 N.Y.S.2d 46, 50 (App. Div. 2012) (stating the general rule that an offer plus acceptance constitutes a contract (citing *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999))).

**[\*35]** or limitation." The documents executed in 2012 stated that "the Museum will have absolute and unconditional ownership of the Work" and that the gifts "will not be subject to any condition or limitation." As was true for the *Palace Banquet* gift, the Met issued acknowledgment letters that made no reference to any deaccession restriction. The pattern followed with respect to the 2011 and 2012 contributions tends to show that the absence of a deaccession restriction from the 2010 Offer of Gift was not an oversight.

As respondent notes, Ardisia and the Tang Family Trusts in 1997 executed an Offer of Promised Gift covering 11 paintings, including *Palace Banquet*. That document stated that "[t]hese works shall not be deaccessioned by the Museum." We accord relatively little weight to this document for two reasons. First, it was not executed by WT Art, which owned *Palace Banquet* when the contribution was made. Second, the Offer of Promised Gift was executed in 1997, 13 years before *Palace Banquet* was donated. We assume arguendo that the Offer of Promised Gift constituted, under New York law, an enforceable agreement to make future charitable contributions of the 11 paintings. *See I & I Holding Corp.*, 12 N.E.2d at 534. But that agreement was superseded by the 2010 Offer of Gift, by which WT Art contributed *Palace Banquet* to the Met without imposing any deaccession restriction. *See Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011) (ruling that, where "a subsequent contract regarding the same matter" exists, it "will supersede the prior contract" (quoting *Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1236 (S.D.N.Y 1994), *aff'd*, 43 F.3d 1458 (2d Cir. 1994) (unpublished table decision))).

Respondent contends that "the Met, C.C. Wang, and Mr. Tang agreed to [a deaccession restriction] as part of the basis for the donation at the beginning." According to respondent, "[t]he promise not to deaccession the paintings . . . was the entire reason that [C.C. Wang] was willing to part with the painting collection." But while C.C. Wang likely hoped and expected that his paintings would remain at the Met forever, we find no evidence that he imposed a legally binding deaccession restriction upon the museum.

In the Wang Trust Agreement, executed in April 1997 between the Met and the C.C. Wang Charitable Trust, the parties expressed their understanding that the Met would "celebrate the expected gift of the paintings" by mounting an exhibition of those works, together with other works owned or previously contributed by C.C. Wang. This exhibition was to be accompanied by a catalog prepared by Dr. Hearn and a

[*36] scholarly essay by Wen Fong. The Met also agreed to name a gallery space the "C.C. Wang Family Gallery" and to name C.C. Wang an "honorary curator" of Chinese painting.

The Met prepared an "interdepartmental memorandum" dated May 9, 1997, which was addressed to the Met's executive director, general counsel, and Asian art curators. The memo attached a copy of the Wang Trust Agreement and explained what "the Museum is required to do" thereunder. The memo recited the conditions stated in the previous paragraph, and the Met duly honored all those conditions. The memo does not refer to, and the executed copy of the Wang Trust Agreement does not mention, any "deaccession restriction" affecting *Palace Banquet* or any of the other paintings in C.C. Wang's collection.

The principal evidence pointing in the other direction consists of statements contained in the minutes of the Met's trustee meetings. An excerpt from the minutes of the January 11, 2011, meeting, at which the trustees discussed the *Palace Banquet* donation, stated that "[t]his work is offered subject to the restriction that it is not to be deaccessioned." The minutes of the trustee meetings at which the 2011 and 2012 gifts were discussed likewise stated that "[t]hese works are offered subject to the restriction that they are not to be deaccessioned" and indicated the trustees' approval of a "request for ratification of restrictive conditions."

It is difficult to reconcile these minutes with the explicit statement in WT Art's Offers of Gift that the donations "shall not be subject to any condition or limitation." The relevant events occurred many years ago, and the evidentiary record on this point is not robust. As best we can discern, the Met appears to have made a unilateral decision that its best interests would be served by keeping *Palace Banquet* (and the other paintings at issue) in its collection indefinitely. Given the circumstances surrounding its acquisition of these works, the adoption of such a policy would not have been surprising.

The Met had been striving to enhance its collection of early Chinese paintings since 1970, when Douglas Dillon served as its president. The paintings collected by C.C. Wang were among the most impressive works available for purchase. Mr. Dillon himself acquired 25 of these paintings and donated them to the Met.

In 1996 Dr. Hearn created a "wish list" of additional works that might be acquired from C.C. Wang, which included the five paintings here at issue. These were not paintings that the Met received as random

[*37] or unexpected gifts, but were works that it consciously and strategically set out to acquire. Given this historical background, it seems entirely plausible that the Met had no intention of ever parting with them.

Mr. Tang credibly testified that his intent in 2010 was for WT Art to donate *Palace Banquet* to the Met without restrictions. He acknowledged his expectation that the Met would keep the paintings in its collection. Indeed, his view was that "these were paintings that were never going to leave the Met." We find that this expectation was based on his awareness of the important role these works played in the Met's fulfillment of its cultural mission, not upon a legally binding deaccession restriction that he imposed on it.

If we were to assume arguendo that a legally binding deaccession restriction did exist, we would find that the resulting discount for lack of marketability would be de minimis. Mr. Conroy calculated a discount in the range of 26% to 31%. We would reject his methodology and result for several reasons.

Mr. Conroy based his analysis in part on studies involving valuation of restricted stock. Needless to say, an investor seeking to buy low and sell high would be greatly incommoded by the inability to sell stock at the time of his choosing. But museums are not in the business of buying and selling art; their mission is to build collections and exhibit art to the public. A "closed form put option" model and a "Monte Carlo put option" model may be useful in various investment contexts. But we are not convinced they are logical ways to value a deaccession restriction placed on a painting donated to a museum.

A proper valuation of a deaccession restriction, we think, would have to take into account (among other things) the museum's deaccession policy, its past practice (if any) of deaccessioning paintings, and the importance the museum places on the paintings subject to the restriction. For example, if a museum had a policy of never deaccessioning artwork, a deaccession restriction would have zero negative value, because the restriction would simply reflect the policy the museum had unilaterally adopted. And if a museum never deaccessioned paintings it regarded as part of its core collections, a deaccession restriction

**[\*38]** affecting such works would likewise have zero or minimal negative value.[8]

The Met's Collection Policy stated that it "will honor any legal restriction, and even absent a binding legal obligation, it will not deaccession a work within 25 years of receiving it if the donor (or his representatives or heirs) objects." In effect, the Met voluntarily imposed on itself, as a courtesy to its donors, a deaccession restriction that would remain in effect for the first 25 years the donated work was in its collection. Any negative effect from a legally binding restriction, therefore, would not reduce the value of the work in the Met's hands until year 26.

In practice the Met appears to have deaccessioned high-value artwork infrequently. During its fiscal year ended June 30, 2010, the Met apparently deaccessioned artwork worth $146,400. During the previous ten years it appears to have deaccessioned annually artwork worth about $3.9 million. The record includes no evidence as to whether the deaccessioned works were paintings, as opposed to sculpture, furniture, medieval armor, or works in other media. Because Mr. Conroy's analysis did not take proper account of the Met's deaccession policy, its past practice of deaccessioning paintings, or the importance the Met placed on the *Palace Banquet* as part of its core collection, we find his analysis inapposite to the task at hand.[9]

---

[8] Respondent contends that "the Met's deaccession policies or how the Met might handle a deaccession restriction are irrelevant" because the definition of FMV "considers a hypothetical buyer/donee not the actual donee." Respondent is correct that our inquiry typically focuses on what a hypothetical willing buyer would pay for the property. *See Bank One Corp.*, 120 T.C. at 305. But if a legally binding deaccession restriction existed here, it would not restrict alienation by every hypothetical owner, as would (say) a restriction preventing sale of common stock. The deaccession restriction would apply uniquely to the Met; by its nature, a deaccession restriction affects only the museum to which the work is contributed. That being so, valuation of the deaccession restriction logically would have to consider the extent to which the restriction actually reduced the value of *Palace Banquet* in the hands of the Met. Indeed, respondent acknowledged in his opening brief that, "[d]ue to the unique nature of the restriction, it is reasonable to look at the value of this discount to a museum, as a particular category of willing buyers."

[9] The parties have directed us to only one judicial precedent that addresses a deaccession restriction imposed on paintings donated to nonprofit institutions. *See Silverman v. Commissioner*, T.C. Memo. 1968-216, 27 T.C.M. (CCH) 1066. In that case a taxpayer donated 143 paintings to 22 institutions that included museums, colleges, hospitals, and historical societies. The paintings were of modest worth, with a reported value of about $100,000 in the aggregate. *Id.* at 1068–69. The donations were subject

**[\*39]** In sum, we find that *Palace Banquet* was not subject to a legally binding deaccession restriction. Even if it were, respondent has not supplied a plausible methodology for calculating the discount for lack of marketability that would accurately reflect the restriction. And we are convinced that, if there were a discount for lack of marketability, it would likely be de minimis on the facts of these cases. We accordingly find that the FMV of *Palace Banquet* on the contribution date was $12 million.

V.    *Section 6662 Accuracy-Related Penalties*

The Commissioner determined accuracy-related penalties under section 6662 for tax years 2010–2012. The record establishes that the IRS secured timely supervisory approval to assert all penalties determined in the FPAAs. *See* § 6751(b).

The Code imposes a penalty for "the portion of any underpayment of tax required to be shown on a return" that is attributable to "[a]ny substantial valuation misstatement." § 6662(a), (b)(3). A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement." § 6662(h). A misstatement is "gross" if the value of property claimed on the return exceeds 200% of the correct amount. § 6662(h)(2)(A)(i).

The value WT Art claimed for the donation of *Palace Banquet* on its return was $26 million. We have determined that the correct value of *Palace Banquet* at year-end 2010 was $12 million. The claimed value was 217% of the correct value. The valuation misstatement was thus "gross."

Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]." § 6664(c)(1). This defense may be available where a taxpayer makes a *substantial* valuation overstatement with respect to charitable contribution property. *See*

---

to the condition that the works could not be deaccessioned for a three-year period. *Id.* at 1068. We agreed with the taxpayer that a restriction against selling a painting "is not of as great importance as a like restriction in respect of securities or other property of rapidly fluctuating value." *Id.* at 1075. But we did not compute a discount for lack of marketability or hypothesize how such a calculation might be made. We simply stated that we had "given weight to this factor in making our ultimate findings" regarding FMV. *Ibid.*

[*40] § 6664(c)(3) (second sentence). But this defense is not available where the overstatement is "gross." *See id.* (first sentence). The 40% penalty thus applies to the portion of WT Art's underpayment attributable to claiming a value for *Palace Banquet* in excess of $12 million.

Respondent also seeks a 20% penalty for an underpayment due to negligence or a substantial understatement of income tax. *See* § 6662(a) and (b)(1) and (2). For 2010, this penalty would apply to the portion of any underpayment not attributable to the valuation misstatement. *See Oconee Landing*, T.C. Memo. 2024-25, at *75 (citing *Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2021-133, 122 T.C.M. (CCH) 342, 343).

We have rejected respondent's contention that WT Art is entitled to a charitable contribution deduction of zero for 2010 on the theory that it failed to secure a "qualified appraisal" for *Palace Banquet*. *See supra* pp. 21–25. Because WT Art is entitled to a charitable contribution deduction of $12 million, there is no underpayment attributable to claiming a deduction in that amount, so the 20% penalty does not apply for 2010.[10]

For 2011 and 2012, the parties have reached agreement that the aggregate FMV of the four donated paintings was $41.5 million, as opposed to the aggregate value of $47.92 million reported on WT Art's returns. *See supra* p. 16. There is no substantial or gross valuation misstatement with respect to any of these gifts, because the value WT Art claimed for each gift did not exceed 150% of the agreed-upon value. *See* § 6662(e)(1)(A). However, respondent seeks a 20% penalty for 2011 and 2012 on the ground of negligence or a substantial understatement of income tax. *See* § 6662(a) and (b)(1) and (2).[11]

---

[10] "The maximum accuracy-related penalty imposed on a portion of an underpayment may not exceed 20 percent . . . (40 percent of the portion attributable to a gross valuation misstatement), notwithstanding that such portion is attributable to more than one of the types of misconduct described in paragraph (a) of this section." Treas. Reg. § 1.6662-2(c). The Court has jurisdiction to determine partnership items and the applicability of any penalty that relates to an adjustment to a partnership item. §§ 6221, 6226; *United States v. Woods*, 571 U.S. 31, 39–42 (2013). Although nothing limits our ability to determine the applicability of more than one accuracy-related penalty at the partnership level, *Oconee Landing*, T.C. Memo. 2024-73, at *3–4, we need not do so here.

[11] The determination of an "underpayment" within the meaning of section 6662(a) cannot be made at the partnership level because partnerships do not pay tax.

**[\*41]** The existence of negligence is determined at the partnership level. *See Oakbrook Land Holdings, LLC v. Commissioner*, T.C. Memo. 2020-54, 119 T.C.M. (CCH) 1351, 1360; Treas. Reg. § 301.6221-1(c). Negligence includes any failure to "make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." Treas. Reg. § 1.6662-3(b)(1)(ii); *see Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d at 233 (citing *Pasternak v. Commissioner*, 990 F.2d 893, 903 (6th Cir. 1993), *aff'g Donahue v. Commissioner*, T.C. Memo. 1991-181).

The "reasonable cause" defense applies with respect to the negligence and substantial understatement penalties. *See* § 6664(c)(1). As applicable here, the central question is whether WT Art had reasonable cause and acted in good faith with respect to the charitable contribution deductions claimed for 2011 and 2012. *See Higbee*, 116 T.C. at 449. We find that it did.

We have already determined that WT Art had reasonable cause for its failure to secure qualified appraisals. *See supra* pp. 22–25. Mr. Tang's take-away from the 2005 examination was that China Guardian's appraisals were acceptable to the IRS. China Guardian prepared the appraisals for the works donated in 2011 and 2012, and WT Art followed substantially the same process in securing those appraisals that it followed in securing the appraisal for *Palace Banquet*. We conclude that WT Art had reasonable cause during 2011 and 2012 for believing that China Guardian was a "qualified appraiser."

During the preparation of the appraisal for *Palace Banquet*, Mr. Tang expressed some concern about the $26 million value estimate China Guardian had supplied. He had expected the valuation to be "about $11 million," and he was surprised that China Guardian's estimate had "changed so much from 10 to 12 to now 26." By contrast, there is no evidence that Mr. Tang expressed any concern about the valuations China Guardian accorded the paintings donated in 2011 and 2012. Indeed, the values it placed on those paintings, which WT Art adopted, were only 17% higher (on average) than the values to which the parties have agreed. We do not think these valuations would strike a reasonable and prudent person as "'too good to be true' under the

*Plateau Holdings*, 122 T.C.M. (CCH) at 343. However, we can determine at the partnership level *the applicability* of the penalty for substantial understatement of income tax. *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 233 (2018); *Plateau Holdings*, 122 T.C.M. (CCH) at 343.

**[\*42]** circumstances." *See* Treas. Reg. § 1.6662-3(b)(1)(ii); *see also Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d at 233. We accordingly find that no accuracy-related penalty applies for 2011 or 2012.

We have considered all of the parties' contentions and arguments that are not discussed herein, and we find them unnecessary to reach, without merit, or irrelevant.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*